## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

```
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x
                                          :
In re:                                    :  Chapter 11
                                          :
Charter School Capital, Inc.,[1]          :  Case No. 25-11016 (CTG)
                                          :
            Debtor.                       :  *Proposed* Hearing Date: July 2, 2025 at 11:00 a.m. (ET)
                                          :  *Proposed* Objection Deadline: At the Hearing
                                          :
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x
```

### DEBTOR'S EMERGENCY MOTION FOR ENTRY OF INTERIM AND FINAL ORDERS (A) AUTHORIZING DEBTOR TO OBTAIN POST-PETITION FINANCING AND TO GRANT SECURITY INTERESTS AND SUPER-PRIORITY ADMINISTRATIVE EXPENSE STATUS PURSUANT TO 11 U.S.C. §§ 105, 364(c) AND 364(d); (B) UTILIZE CASH COLLATERAL AND PAY CERTAIN RELATED FEES AND CHARGES; (C) MODIFYING THE AUTOMATIC STAY PURSUANT TO 11 U.S.C. § 362; AND (D) SCHEDULING A FINAL <u>HEARING PURSUANT TO BANKRUPTCY RULE 4001</u>

Charter School Capital, Inc., the above-captioned debtor and debtor-in-possession (the "<u>Debtor</u>" or "<u>Borrower</u>"), by and through its undersigned counsel, hereby moves the Court (the "<u>Motion</u>") pursuant to sections 105(a), 362, 363, 364, 503, 506, and 507 of title 11 of the United States Code (the "<u>Bankruptcy Code</u>"), rules 2002, 4001, 4002, 6003, 6004, and 9014 of the Federal Rules of Bankruptcy Procedure (the "<u>Bankruptcy Rules</u>"), and rule 2002-1, 4001-2, and 9013-1 of the Local Rules of the United States Bankruptcy Court for the District of Delaware (the "<u>Local Rules</u>") for entry of interim and final orders authorizing the Debtor to enter into a senior secured credit facility (the "<u>DIP Financing</u>") in an aggregate amount not to exceed $5,000,000 (the "<u>DIP Commitment</u>"). The DIP Commitment will be made available (i) in an aggregate amount of $2,500,000 upon the entry of an interim order approving the DIP Financing (the "<u>Interim DIP</u>

---

[1] The Debtor's mailing address is 9450 SW Gemini Dr, PMB 559064, Beaverton, OR 97008-7105, and the last four digits of the Debtor's federal tax identification number are 4278.

Order"), substantially in the form attached hereto as **Exhibit A**, and (ii) on a final basis upon the entry of a final order approving the DIP Financing (the "Final DIP Order," and together with the Interim DIP Order, the "DIP Orders").  The DIP Financing is being provided substantially on the terms set forth in the *Senior Secured Superpriority Debtor-in-Possession Credit Facility Term Sheet* between the Debtor and East West Bank, N.A. (the "DIP Lender"), annexed to the proposed Interim DIP Order as **Exhibit 2** (the "DIP Term Sheet,"[2] and together with any ancillary, collateral, or related documents and agreements, the "DIP Loan Documents").  Through the Motion, the Debtor also seeks an order (i) authorizing use of cash collateral and payment of certain related fees and charges, (ii) modifying the automatic stay to the extent applicable, (iii) granting related relief, and (iv) scheduling a final hearing.  In support of the Motion, the Debtor submits the *Declaration of Brian Ayers in Support of Debtor's Emergency Motion for Entry of Interim and Final Orders (I) Authorizing the Debtor to Obtain Postpetition Financing; (II) Granting Liens and Providing Superpriority Administrative Expense Status; (III) Authorizing Use of Cash Collateral; (IV) Modifying the Automatic Stay; (V) Scheduling a Final Hearing; and (VI) Granting Related Relief*, filed contemporaneously herewith, and respectfully states as follows:

## PRELIMINARY STATEMENT

1.     When the Debtor commenced the above-captioned chapter 11 case (the "Chapter 11 Case"), it did so believing that its business operations would generally continue in the ordinary course and that its funding was sufficient to run the proposed sale process through closing.

2.     The Debtor did not anticipate one of its contract counterparties, Bank of America, N.A. ("Bank of America") refusing to comply with its obligations under a Note Purchase Agreement (defined below) among the Debtor, non-Debtor subsidiary PCSRC (defined below),

---

[2] Capitalized terms not otherwise defined herein shall have the meanings ascribed to them in the DIP Term Sheet.

and Bank of America.  The Note Purchase Agreement is one of a handful of agreements that form the basis for the Receivables Cycle (defined below), by which the Debtor funds its Money To Run Your School business line, which provides receivables financing to charter schools.

3.     Under the Note Purchase Agreement, Bank of America is obligated to purchase notes given the satisfaction of certain conditions precedent.  The proceeds from these purchases drive the Receivables Cycle, which in turn drives the Money To Run Your School business line, which is an important part of the Debtor's business.

4.     Bank of America's refusal to fulfill its purchase obligations since the Petition Date has caused severe liquidity issues for the Debtor, to the point where the Debtor cannot continue the Money To Run Your School business line without supplemental funding.  To staunch the fallout, the Debtor has negotiated emergency funding as further described in this Motion and in accordance with the terms in the DIP Term Sheet and the Interim DIP Order.

5.     Given the Debtor's liquidity concerns, the DIP Financing is necessary and will prevent immediate and irreparable harm to the Debtor, its business, its estate, and its creditors. Accordingly, the Debtor respectfully requests that the Court approve the DIP Financing.

## JURISDICTION AND VENUE

6.     The Court has jurisdiction over this Motion pursuant to 28 U.S.C. § 1334.  Venue is proper in this district pursuant to 28 U.S.C. §§ 1408 and 1409.  This matter is core within the meaning of 28 U.S.C. § 157(b), and, pursuant to Rule 9013-1(f) of the Local Rules, the Debtor consents to the entry of a final order by the Court in connection with this Motion to the extent that it is later determined that the Court, absent consent of the parties, cannot enter final orders or judgments consistent with Article III of the United States Constitution.

7.     Venue is proper before this Court pursuant to 28 U.S.C. §§ 1408 and 1409.

8.      The statutory predicates for the relief sought herein ae sections 105(a), 362, 363, 364, 503, 506, and 507 of the Bankruptcy Code, and the procedural predicates are Rules 2002, 4001, 6003, 6004, and 9014 of the Bankruptcy Rules, and Rules 2002-1, 4001-2, and 9013-1 of the Local Rules.

## BACKGROUND

### A.      Procedural Background

9.      On June 8, 2025 (the "Petition Date"), the Debtor commenced this Chapter 11 Case. The Debtor continues to manage its property as debtor-in-possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.  No request has been made for the appointment of an examiner, and a creditors' committee has not been appointed in this case.

### B.      Overview of the Debtor's Business

10.      Founded in 2006, CSC's vision is to ensure that all children have access to a nurturing school environment where they can flourish.  To that end, CSC supports the charter school industry by providing development, financing, and services to charter school leaders throughout the United States.  Over the course of its 19-year history, CSC has provided financing to approximately 1,000 of the approximately 8,000 charter schools in the United States, supporting more than 2 million kids' education, and deploying over $3 billion in capital.  Over the years, CSC's efforts have been supported by financial advice and investment capital from some of the largest global financial institutions including Bank of America, Citibank, Wells Fargo, Vanguard, BlackRock, Goldman Sachs Securities, along with regional banks across the country, and other significant institutions supporting public school finance across the country.

11.      CSC is a privately owned corporation organized under the laws of Delaware, with corporate headquarters in Portland, Oregon.  CSC has three wholly owned direct subsidiaries:

Public Charter School Receivables Company, LLC ("PCSRC"), Charter School Realty Management, LLC, and Charter School Capital UN, Ltd.

12.  CSC operates three primary lines of business: (i) Money To Buy Your School; (ii) Money To Run Your School; and (iii) Kids To Fill Your School.  The Money To Run Your School business line is the main business line currently at issue as it is the one directly affected by the interruption of the Receivables Cycle.

13.  The Money To Run Your School line of business is operated through non-Debtor PCSRC and provides receivables financing to charter schools.

14.  PCSRC finances the purchase of the receivables through secured financing provided by Bank of America pursuant to a Note Purchase Agreement[3] and an Indenture[4] in which U.S. Bank, National Association ("US Bank") serves as Indenture Trustee.  PCSRC earns a profit on the spread between the purchase price paid for the receivables and amounts collected, net of financing costs (the "Receivables Cycle").

15.  The Debtor serves as the servicer of the receivables pursuant to a Sale and Servicing Agreement.[5]  Pursuant to the Sale and Servicing Agreement, the Debtor, in the normal course of the Receivables Cycle, acquires a receivable from a School[6] pursuant to an individualized receivables purchase agreements directly between the Debtor and each of the Schools.  The

---

[3] The Debtor is a party to a Note Purchase Agreement by and among Bank of America as investor, the Debtor, as servicer and as a seller, Charter School Funding Company, LLC, as a Seller, and PCSRC, as issuer, dated as of July 9, 2021, as amended and further supplemented or otherwise modified and in effect from time to time (the "Note Purchase Agreement").

[4] Indenture Supplement (the "Indenture Supplement"), dated as of July 9, 2021, by and among PCSRC, the Debtor (as servicer), and US Bank, as Indenture Trustee (the "Indenture Trustee").

[5] The certain Amended and Restated Sale and Servicing Agreement, dated as of July 9, 2021 by and among PCSRC, LLC, as purchaser, the Debtor, as Seller and Servicer, Charter School Funding Company, LLC, as seller, and U.S Bank National Association as indenture trustee (the "Sale and Servicing Agreement").

[6] As defined in the Sale and Servicing Agreement, ("School") shall mean each school that executes a receivables purchase agreement with the Seller relating to receivables.

receivables are purchased from a School at a negotiated discount.  The Debtor sells the receivables to PCSRC via a bill of sale, PCSRC transfers funds to the Debtor, and the Debtor uses those funds to acquire the receivables from the Schools.  In connection with the Receivables Cycle, the Debtor also earns certain fees, including servicing fees.

16.     The receivables consist of the right to payment of a School by a specified State or local governmental entity (the "Obligors") of a certain amount of money relating to or based on attendance at or services provided in connection with the School.  Each receivable consists of a single right to payment at an expected future date and does not bear interest.  This results in upfront capital being provided to the School, rather than a School having to wait until the payments are scheduled for receipt to access such capital.

17.     To ensure collection of the Obligor's payment that would be directed to the School, a paying agent agreement is entered into by and among the Debtor, the third-party paying agent (the "Paying Agent"), and the applicable School.  A control agreement may also be put in place in favor of the Paying Agent against the School's bank account that is maintained with US Bank.

18.     Each Obligor is notified and an intercept is put in place resulting in the payment of the receivable by the Obligor being directed either directly to the Paying Agent or to an account controlled by the Paying Agent.

19.     Upon receipt of the Obligor's payment, the Paying Agent transfers the funds back to non-Debtor PCSRC pursuant to Paying Agent instructions provided by the Debtor.  PCSRC then pays down amounts owed under the Note Purchase Agreement.  To the extent that an excess amount is available after the required paydown of the Note Purchase Agreement, such excess may be transferred from PCSRC up to the Debtor's operating account as a distribution of profit.

Separately, the Debtor may also earn a monthly "servicing fee," as calculated in the Sale and Servicing Agreement for its part in facilitating the transactions.

20.    CSC is currently financing 15-20 charter schools through the Money To Run Your School business line.  These Schools rely on this financing to satisfy, among other things, payroll obligations of teachers and staff.

**C.    The Debtor Needs an Infusion of Cash to Fund the Money To Run Your School Business**

21.    As described herein, in connection with the Money To Run Your School program, Bank of America purchases notes pursuant to the Note Purchase Agreement, the proceeds of which PCSRC uses to finance the purchase of receivables by the Schools.  This process is part of the Receivables Cycle, through which the Schools receive funding for operations.

22.    Following prepetition discussions with Bank of America, the Debtor commenced this Chapter 11 Case believing that no party would interfere with the Receivables Cycle and that the Schools would continue to be funded in the ordinary course.  However, the Debtor has now been informed that Bank of America will not release the note purchase proceeds that drive the Receivables Cycle.  Since the Petition Date, the Debtor has made three formal requests for funding in accordance with the Note Purchase Agreement, but to date, Bank of America has refused to continue funding.

23.    Without funding, the Debtor's receivables business cannot function, and the Schools face the prospect of failing to make upcoming payroll obligations.  The Debtor needs to fund these obligations right away or face the prospect of shutting down the Money To Run Your School business line, and there is no option outside of the proposed DIP Financing that can provide this funding fast enough.

**D.**      **The DIP Financing Will Support the Administration of the Chapter 11 Case**

24.      In addition to preventing the shuttering of the Money To Run Your School business line, the DIP Financing will support the administration of the Debtor's Chapter 11 Case by, among other things, facilitating the Debtor's efforts to retain their employees, including through a potential key employee retention plan, which has become necessary due to this emergent business disruption.  It is imperative that the Debtor maintain its employee base in order to ensure the smooth operation of the business through the closing of the aforementioned sale.  Moreover, the DIP Financing will insulate the Debtor from future unanticipated issues that may jeopardize the sale process and the Chapter 11 Case, and by extension the estate and the Debtor's creditors.

**E.**      **The Proposed DIP Financing**

25.      The Debtor proposes to enter into the DIP Financing in order to fund obligations that would normally be satisfied through the standard workings of the Receivables Cycle and to resolve the Debtor's liquidity issues.  These obligations are necessary to maintain an important business line of the Debtor's business portfolio.  The DIP Financing will provide the Debtor with up to $5,000,000 to fund the necessary obligations of the Debtor.  Without such funding, the Debtor could potentially need to shut down the Money To Run Your School business line, which would harm not only the Debtor's estate and its creditors through loss of revenue, reputational harm, and a negative impact on the Debtor's sale value, but the Schools as well, which could see their charters jeopardized.  Moreover, the DIP Financing would support the Debtor's robust sale process by providing more marketing time for the Sales Agent.

26.     Pursuant to Rule 4001 of the Bankruptcy Rules and Rule 4001-2 of the Local Rules,

the principal terms of the DIP Term Sheet are as follows:[7]

| Bankruptcy Code / Rule | Summary of Material Terms[8] |
|---|---|
| **Borrowers:**<br>*Bankruptcy Rule 4001(c)(1)(B);*<br>*Local Rule 4001-2(a)(i)(J)* | Charter School Capital, Inc. as debtor and debtor in possession.<br><br>*See* DIP Term Sheet p. 1. |
| **DIP Lender:**<br>*Bankruptcy Rule 4001(c)(1)(B)* | East West Bank<br><br>*See* DIP Term Sheet p. 1. |
| **DIP Facility:**<br>*Bankruptcy Rule 4001(c)(1)(B);*<br>*Local Bankruptcy Rules 4001-*<br>*2(a)(ii) and 4001-2(a)(i)(B)* | The DIP Lender agrees to make senior secured superpriority debtor-in-possession loans to the Borrower consisting of delayed-draw term loans to be made from time to time during the Availability Period in accordance with the Draw Schedule set forth in the DIP Term Sheet in an aggregate principal amount not to exceed at any time outstanding aggregate principal commitments of $5,000,000 upon compliance with the conditions set forth in the DIP Term Sheet under the heading "Conditions Precedent to Subsequent DIP Loans."<br><br>*See* Interim DIP Order ¶ 1; DIP Term Sheet p. 1. |
| **Borrowing Limits:**<br>*Bankruptcy Rule 4001(c)(1)(B);*<br>*Local Bankruptcy Rule 4001-*<br>*2(a)(i)(A)* | Subject to limitations on borrowing under the DIP Term Sheet, the Debtor may draw up to $2,500,000 upon entry of the Interim DIP Order and up to $5,000,000 in the aggregate upon entry of the Final DIP Order.<br><br>*See* Interim DIP Order ¶ 1; DIP Term Sheet pp. 1-2. |
| **Budget:**<br>*Bankruptcy Rule 4001(c)(1)(B)* | The DIP Loans will be used strictly in accordance with the Approved Budget (subject to the Permitted Variances), for (i) working capital and general corporate purposes of the Borrower, (ii) for bankruptcy-related costs and expenses, and (iii) for costs and expenses related to the DIP Credit Facility.<br><br>By no later than 5:00 PM (Eastern Time) on Thursday after the second (2nd) full calendar week following the entry of the Interim Order (the "Interim Order Entry Date" and such testing date, the "First Testing Date"), and no later than 5:00 PM (Eastern Time) on each Thursday thereafter (together with the First Testing Date, each a "Testing Date"), the Borrower shall deliver to the DIP Lender, in a form consistent with the form of the Approved Budget, a variance report comparing the Borrower's actual receipts and disbursements by line item for the prior calendar week, beginning with the fourth (4th) week after the Interim Order Entry Date, and the prior four (4) calendar weeks (on a cumulative basis) with the projected receipts and disbursements for such week and, beginning with the fourth (4) calendar week after the Interim Order |

---

[7] To the extent any aspect of the following DIP Term Sheet summary contradicts the DIP Term Sheet, the DIP Term Sheet shall control.

[8] Capitalized Terms used but not otherwise defined within this table shall have the meanings ascribed to them in the DIP Term Sheet.

| Bankruptcy Code / Rule | Summary of Material Terms[8] |
|---|---|
| | Entry Date, the prior four (4) calendar weeks (on a cumulative basis) as reflected in the applicable Approved Budget for such weeks (the "Weekly Variance Report").<br><br>By not later than 5:00 PM Eastern Time on the First Testing Date and on each Thursday thereafter that is the four-week (4-week) anniversary of the First Testing Date (each such date, a "Monthly Variance Testing Date" and each such four-week period, the "Monthly Testing Period"), the Borrower shall provide to the DIP Lender a report detailing (i) the aggregate disbursements of the Borrower and aggregate receipts during the applicable Monthly Testing Period for all operating disbursements; and (ii) any variance (whether positive or negative, expressed as a percentage) between the aggregate disbursements made during such Monthly Testing Period by the Borrower against the aggregate disbursements for the Monthly Testing Period, as set forth in the applicable Approved Budget (a "Monthly Variance Report," together with the Weekly Variance Report, the "Approved Variance Reports").<br><br>The Borrower shall comply with the following (collectively, the "Permitted Variances"):<br><br>As of any Monthly Variance Testing Date, for the Monthly Testing Period ending on the Sunday preceding such Monthly Variance Testing Date, the Borrower shall not allow without the DIP Lender's approval: all operating disbursements (excluding professional fees and restructuring charges arising on account of the Chapter 11 Case (including United States Trustee fees and professional fees and expenses incurred by the DIP Lender or any privacy ombudsman)) to be greater than 120% of the estimated disbursement for such items in the Approved Budget, each for such Monthly Testing Period provided that, if disbursements are below the budgeted disbursements for a Monthly Testing Period, any such unused disbursements shall be rolled into the Approved Budget for the following next Monthly Testing Period. Any material changes to the Approved Budget, shall be subject to the DIP Lender's approval. For the avoidance of doubt, any reference to "written consent" hereunder shall include consent granted by email.<br><br>Commencing at 5:00 P.M. (Eastern Time) on the Thursday of the fourth full calendar week after the Interim Order Entry Date, and continuing at 5:00 P.M. (Eastern Time) on the Thursday of every fourth (4th) week thereafter, the weekly budget shall be updated, and if such updated budget is in form and substance satisfactory to the DIP Lender, it shall become the "Approved Budget" for purposes of the DIP Term Sheet and the DIP Orders. Any amendments, supplements, or modifications to the Approved Budget or an Approved Variance Report shall be subject to the prior written approval of the DIP Lender prior to the implementation thereof. If the DIP Lender has not objected, in writing, to a proposed updated budget, or an amendment, supplement, or modification to the Approved Budget or an Approved Variance Report, within three (3) business days after the DIP Lender's receipt thereof, such proposed updated budget, amendment, supplement, or modification shall be deemed acceptable to and approved by the DIP Lender. Until any such updated budget, amendment, supplement, or modification has been approved by the DIP Lender, the Borrower shall be subject to and be governed by the terms of the Approved Budget then in effect<br><br>*See* DIP Term Sheet pp. 2-4. |

| Bankruptcy Code / Rule | Summary of Material Terms[8] |
|---|---|
| **Interest Rate:**<br>*Bankruptcy Rule 4001(c)(1)(B); Local Bankruptcy Rule 4001-2(a)(i)(B)* | <u>Interest Rate:</u>  Interest will be payable on the unpaid principal amount of all DIP Loans and all overdue interest thereon at a rate per annum equal to 12%, payable and the end of such interest period in arrears in kind by adding such interest to the principal amount of such DIP Loans. All interest and fees under the DIP Term Sheet shall be calculated on the basis of a 360-day year for the actual number of days elapsed.  All accrued interest which for any reason has not theretofore been paid shall be paid in full on the date on which the final principal amount of the DIP Loans is paid.<br><br><u>Default Rate:</u>  At all times automatically following the occurrence and during the continuance of an Event of Default, principal, interest, and all other amounts due on the DIP Loans shall bear interest at a rate equal to 2.00% per annum in excess of the interest rate set forth under "Interest Rate" above.<br><br>*See* DIP Term Sheet p. 5-6. |
| **Expenses and Fees:**<br>*Bankruptcy Rule 4001(c)(1)(B); Local Bankruptcy Rule 4001-2(a)(i)(B); Local Rule 4001-2(a)(i)(K)* | <u>Upfront Fee:</u>  2.5% upfront fee on total DIP Commitment, earned, non-refundable, and allowed on a final basis upon entry of the Interim Order and payable from the proceeds of the Interim DIP Loan Draw (the "<u>Upfront Fee</u>").<br><br><u>Exit Fee:</u>  5% exit fee on the total DIP Commitment, earned, non-refundable, and allowed on a final basis upon entry of the Interim Order and paid in cash upon the repayment of the DIP Loans (including voluntary prepayments), the termination of the DIP Commitment, or upon the acceleration of the DIP Loans following an Event of Default (the "<u>Exit Fee</u>").<br><br><u>Extension Fee:</u>  2% extension fee on the total DIP Commitment, earned, non-refundable, and allowed upon the Borrower's request to extend the Initial Maturity Date (as defined below) (the "<u>Extension Fee</u>").  The Extension Fee will be paid in kind by adding such Extension Fee to the principal amount of the DIP Loans.<br><br><u>Expenses:</u>  All out-of-pocket prepetition and postpetition reasonable and documented fees, costs, and expenses of the DIP Lender relating to the DIP Credit Facility, the Stalking Horse APAs, and the Chapter 11 Case (including, without limitation, prepetition and postpetition reasonable and documented fees and disbursements of counsel and advisors), subject to the DIP Orders, shall be payable by Borrower following written demand and without the requirement for Bankruptcy Court approval.<br><br>*See* Interim DIP Order ¶ 2; DIP Term Sheet pp. 5, 16. |
| **Maturity Date:**<br>*Bankruptcy Rules 4001(b)(l)(B)(iii) and 4001(c)(1)(B)* | The DIP Loans (together with all other DIP Obligations) shall mature and be due and payable on the earliest to occur of the following (such date, the "<u>Maturity Date</u>"):<br><br>(i)        August 6, 2025 (the "<u>Initial Maturity Date</u>"), which Initial Maturity Date may be extended for 30 calendar days upon request by the Borrower subject to payment of the Extension Fee;<br><br>(ii)       28 calendar days after the Interim Order Entry Date if the Final Order has not been entered by the Bankruptcy Court on or before such date, or otherwise extended by agreement of the DIP Lender;<br><br>(iii)      Five (5) days after the termination of a Stalking Horse APA for any reason, other than (a) as a result of (1) any breach of a Stalking Horse APA by the Purchaser |

| Bankruptcy Code / Rule | Summary of Material Terms[8] |
|---|---|
|  | (as defined in the Stalking Horse APA) or (2) the Borrower's selection of an alternative bid that either has (A) the consent of the DIP Lender or (2) results in the indefeasible payment in full in cash of the DIP Obligations, in each case, as of the closing of such alternative bid or (b) a termination to pursue approval of an Alternative Transaction (as defined in the Stalking Horse APA) that results in the indefeasible payment in full in cash of the DIP Obligations as of the closing of such Alternative Transaction; <br><br>(iv)　　the date of consummation of any sale of all or substantially all of the assets of the Borrower pursuant to section 363 of the Bankruptcy Code; <br><br>(v)　　the substantial consummation (as defined in section 1101 of the Bankruptcy Code and which for purposes hereof shall be no later than the "effective date" thereof) of a plan of reorganization filed in the Chapter 11 Case that is confirmed pursuant to an order entered by the Bankruptcy Court; <br><br>(vi)　　entry of an order by the Bankruptcy Court approving (a) a motion seeking conversion or dismissal of the Chapter 11 Case or (b) a motion seeking the appointment or election of a trustee, a responsible officer, or examiner with enlarged powers relating to the operation of the Borrower's business; <br><br>(vii)　　the date, if any, on which the Bankruptcy Court orders the conversion of the Chapter 11 Case to a liquidation pursuant to Chapter 7 of the Bankruptcy Code; and <br><br>(viii)　　the date of acceleration of all or any portion of the DIP Loans and the termination of the DIP Commitment in respect thereof upon the occurrence of an Event of Default. <br><br>Notwithstanding anything in the DIP Term Sheet or the DIP Orders to the contrary, simultaneously with the consummation of any Alternative Transaction that results in the occurrence of the Maturity Date pursuant to clause (iii) above, the Borrower shall pay (or cause to be paid), subject to the Carve Out, the outstanding amount of the DIP Loans (together with all other DIP Obligations) from the proceeds of such Alternative Transaction reserving proceeds (x) sufficient to pay accrued, unpaid, and allowed administrative expenses (as of the date of the closing of such Alternative Transaction) to the extent set forth in the Approved Budget and (y) in an amount negotiated in good faith by the DIP Lender and the Borrower that is necessary to fund costs for the wind-down of Borrower's bankruptcy estates following the closing of such Alternative Transaction. <br><br>*See* DIP Term Sheet pp. 6-7. |
| **Prepayment:** <br>*Local Bankruptcy Rule 4001-2(a)(i)(I)* | Optional Prepayment:  The Borrower may prepay the DIP Loans in whole or in part at any time upon delivery of written notice to the DIP Lender no later than 1:00 PM (Eastern Time) three (3) business days prior to the date of such prepayment (or such later time as the DIP Lender may agree to acting reasonably); *provided* any such prepayments shall be subject to the Exit Fee on the portion of the DIP Loans so repaid. All optional prepayments shall be applied to the DIP Loans in accordance with the application of payment provisions set forth in the "Mandatory Prepayments" section below.  Any amounts so prepaid may not be reborrowed. <br><br>Mandatory Prepayment:  Prior to the occurrence of an Event of Default, upon receipt of proceeds described in clauses (i) through (iii) below, the Borrower shall remit to |

| Bankruptcy Code / Rule | Summary of Material Terms[8] |
|---|---|
| | the DIP Lender to pay or prepay, to the extent provided below, the DIP Obligations (together with a cash reserve established by the DIP Lender to cover asserted contingent and indemnity obligations) in each case owed to applicable DIP Lender specified in clauses (i) through (iii) below, ratably and to the extent specified below, until such obligations are paid in full as follows:<br><br>(i)   100% of the net cash proceeds of any sale or disposition of all or substantially all of Borrower's assets pursuant to section 363 of the Bankruptcy Code (other than Sales to the Stalking Horse Purchaser pursuant to the Stalking Horse APAs) simultaneous with the consummation thereof, after funding the Carve Out and reserving proceeds sufficient to pay accrued, unpaid, and allowed administrative expenses (as of the closing of such Sale) to the extent set forth in the Approved Budget; and<br><br>(ii)  100% of the net cash proceeds received as a result of the Borrower incurring or issuing any Indebtedness that is not expressly permitted to be incurred or issued pursuant to the DIP Term Sheet, provided that Borrower shall be permitted to extend trade credit in the ordinary course of business.<br><br>Any amounts so paid or prepaid may not be reborrowed.  No reinvestment of the proceeds of any extraordinary receipts, asset sales, or other proceeds described above shall be permitted without the prior written consent of the DIP Lender.<br><br>*See* DIP Term Sheet pp. 7-8. |
| **Collateral and Priority**<br>*Bankruptcy Rules 4001(c)(1)(B)(i) and 4001(c)(1)(B)(ii); Local Rule 4001-2(a)(i)(G)* | First Priority Security Interest:  All DIP Loans and other liabilities and obligations owed to the DIP Lender under or in connection with the DIP Term Sheet and the Interim Order and/or Final Order, (collectively, the "DIP Obligations"), in all cases subject to the "Carve Out" (as defined in the DIP Orders), shall be:<br><br>(i)   pursuant to section 364(c)(1) of the Bankruptcy Code, entitled to superpriority administrative expense claim status in the Chapter 11 Case of the Borrower with priority over any and all administrative expenses, whether heretofore or hereafter incurred, of the kind specified in sections 503(b) or 507(a) of the Bankruptcy Code;<br><br>(ii)  pursuant to sections 364(c)(2) secured by a perfected first-priority lien on the DIP Collateral (as defined below) granted in favor of the DIP Lender;<br><br>(iii) pursuant to section 364(c)(3), secured by a perfected junior lien on DIP Collateral granted in favor of the DIP Lender, to the extent such DIP Collateral is subject to a prepetition lien; and<br><br>(iv)  pursuant to section 364(d)(1), secured by a perfected first-priority priming lien on DIP Collateral granted in favor of the DIP Lender, senior to all other liens (collectively, the liens described in clauses (ii), (iii) and (iv), the "DIP Liens").<br><br>DIP Collateral:  "DIP Collateral" means, collectively, all assets of the Borrower and its bankruptcy estate of any nature whatsoever and wherever located, whether first arising prior to or following the Petition Date, now owned or hereafter acquired, including all accounts, chattel paper, commercial tort claims, deposit accounts, documents, equipment, general intangibles, goods, instruments, inventory, investment property, letter-of-credit rights, real property, books and records, and all proceeds, rents, profits, and offspring of the foregoing, other than (i) assets, contracts, leases, |

| Bankruptcy Code / Rule | Summary of Material Terms[8] |
|---|---|
| | and other licenses solely to the extent a DIP Lien is not permitted by law to attach to such property, in which case the proceeds of such assets, contracts, leases, and other licenses shall be DIP Collateral and (ii) avoidance actions under chapter 5 of the Bankruptcy Code, provided that DIP Collateral shall include proceeds of avoidance actions upon entry of the Final Order.<br><br>All of the liens granted to the DIP Lender in the DIP Collateral shall be effective and perfected by the Interim Order and the Final Order and without the necessity of the execution of mortgages, security agreements, pledge agreements, financing statements, or other agreements. Notwithstanding the foregoing, the Borrower shall take all action that may be reasonably necessary or desirable, or that the DIP Lender may reasonably request, to at all times maintain the validity, perfection, enforceability, and priority of the security interest and liens of the DIP Lender in the DIP Collateral, or to enable the DIP Lender to protect, exercise or enforce its rights hereunder, under the DIP Orders and in the DIP Collateral.<br><br>*See* Interim DIP Order, ¶¶ 5, 7, 8; DIP Term Sheet pp. 4-5. |
| **Carve Out**<br>*Bankruptcy Rule 4001(b)(1)(B)(iii); Local Bankruptcy Rule 4001-2(a)(i)(F)* | Carve Out:<br><br>(a) **Priority of Carve Out**. Notwithstanding anything to the contrary in this Interim Order, the DIP Liens and the DIP Superpriority Claims shall be subject and subordinate to payment of the Carve Out. The Carve Out shall be senior to all claims and liens over all assets of the Debtor, including any DIP Collateral, as set forth in this Interim Order.<br><br>(b) **Carve Out.** The term "Carve Out" shall mean the sum of (i) unpaid fees and expenses required to be paid by the Debtor to the Clerk of this Court or to the U.S. Trustee under 28 U.S.C. § 1930(a), together with any interest thereon pursuant to 31 U.S.C. § 3717, which shall not be subject to the Approved Budget; (ii) Court-allowed fees and expenses of a trustee in any Successor Case appointed under section 726(b) of the Bankruptcy Code in an amount not to exceed $25,000, (iii) to the extent allowed at any time, whether by interim order, procedural order, or otherwise, all unpaid fees and expenses (the "Allowed Professional Fees") incurred by persons or firms retained by the Debtor pursuant to sections 327, 328, or 363 of the Bankruptcy Code (the "Debtor Professionals") at any time before or on the first business day following delivery by the DIP Lender of a Carve Out Trigger Notice, whether allowed by this Court prior to or after delivery of a Carve Out Trigger Notice (the "Pre-Trigger Date Fees"); subject to and not to exceed the Approved Budget and any limits by this Interim Order, provided that Debtor Professional may carry forward budgeted but unused disbursements set forth in the Approved Budget for any week for use in any subsequent week, and (iv) Allowed Professional Fees of the Debtor Professionals in an aggregate amount not to exceed $300,000, incurred after the first calendar day following delivery by the DIP Lender of the Carve Out Trigger Notice (the "Carve Out Trigger Date"), to the extent allowed at any time, whether by interim order, procedural order, or otherwise (the amounts set forth in this clause (iv) being the ("Post-Carve Out Trigger Notice Cap" and together with the Pre-Trigger Date Fees, the "Carve Out Amount")).<br><br>(c) For purposes of the foregoing, "Carve Out Trigger Notice" shall mean a written notice delivered by email (or other electronic means) by the DIP Lender or its counsel to the Debtor, its lead restructuring counsel, and the U.S. Trustee, which notice may be delivered following the occurrence and during the continuation of an Event of Default and acceleration of the DIP Obligations under |

| Bankruptcy Code / Rule | Summary of Material Terms[8] |
|---|---|
| | the DIP Facility stating that the Post-Carve Out Trigger Notice Cap has been invoked.  On the day on which a Carve Out Trigger Notice is received by the Debtor, the Carve Out Trigger Notice shall constitute a demand to the Debtor to transfer cash to the Carve Out Account in an amount equal to the Carve Out Amount (which shall include:  (i) an amount equal to the Debtor's professional good faith estimate of the Pre-Trigger Date Fees unpaid as of the Carve Out Trigger Date; and (ii) an amount equal to the Post-Carve Out Trigger Notice Cap). |

The table continues below with items (d) through (h):

<table>
<tr><td>

(d)      On a weekly basis, the fees of the Debtor Professionals provided in the Approved Budget shall be funded into an escrow account with Potter Anderson & Corroon LLP to satisfy the professional fees included within the Carve Out (the "<u>Professional Fee Reserve</u>").  The funds on deposit in the Professional Fee Reserve shall be available to satisfy the obligations owed to the Debtor Professionals benefiting from the Carve Out, including all Allowed Professional Fees.  Any excess amounts (if any) in the Professional Fee Reserve after payment of all Allowed Professional Fees shall be subject in all respects to the DIP Liens.

(e)      **Carve Out Account**.  Immediately upon the delivery of a Carve Out Trigger Notice, and prior to the payment of any DIP Obligations, the Debtor shall be required to deposit cash in an amount up to the Carve Out Amount into the Professional Fee Reserve.  The Professional Fee Reserve shall be available only to satisfy amounts included in the Carve Out until such amounts are paid in full, and thereafter available to the DIP Lender.  The amount in the Professional Fee Reserve shall be reduced on a dollar-for-dollar basis for amounts included in the Carve Out that are paid after the delivery of the Carve Out Trigger Notice, and the Professional Fee Reserve shall not be replenished for such amounts so paid.  The failure of the Professional Fee Reserve to satisfy in full the amount set forth in the Carve Out shall not affect the priority of the Carve Out.

(f)      **Carve Out Draw**.  Subject to exhaustion of the DIP Commitment, the Debtor shall be permitted to draw on the DIP Facility in the Carve Out Amount less the amounts contained in the Professional Fee Reserve, notwithstanding any default, Event of Default, or the occurrence of a Carve Out Trigger Date; provided, however, the DIP Lender shall not have any obligation to fund any Carve Out shortfall beyond what it is obligated to fund under the DIP Commitment.  Any Carve Out Trigger Notice shall be deemed a consent by the DIP Lender to the Debtor depositing Cash Collateral or proceeds of the DIP Facility into the Professional Fee Reserve up to an amount necessary to ensure that the amount in the Professional Fee Reserve equals the sum of the Carve Out Amount.

(g)      **Payment of Allowed Professional Fees Prior to the Carve Out Trigger Date**.  Any payment or reimbursement made prior to the occurrence of the Carve Out Trigger Date in respect of any Allowed Professional Fees shall not reduce the Carve Out.

(h)      **No Direct Obligation to Pay Professional Fees**.  The DIP Lender shall not be responsible for the direct payment or reimbursement of any fees or disbursements of any of the Professional Persons incurred in connection with the Chapter 11 Case or any Successor Cases under any chapter of the Bankruptcy Code.  Nothing in the Interim Order or otherwise shall be construed to obligate the DIP Lender in any way to pay compensation to, or to reimburse expenses of, any of the Professional Persons, or to guarantee that the Debtor or its estate has sufficient funds to pay such compensation or reimbursement.  Notwithstanding any provision in this paragraph to the contrary, no portion of the Carve Out, any Cash Collateral, any DIP

</td></tr>
</table>

| Bankruptcy Code / Rule | Summary of Material Terms[8] |
|---|---|
| | Collateral or any proceeds of the DIP Facility (including any disbursements set forth in the Approved Budget or obligations benefitting from the Carve Out) shall be utilized for the payment of professional fees and disbursements to the extent restricted under Paragraph 23 of the Interim DIP Order.<br><br>(i)    **No Waiver of Right to Object to Fees**.  Nothing contained in the Interim Order shall be construed: (i) to exempt Debtor Professionals who may receive interim compensation payments or reimbursement of expenses pursuant to any Court-approved procedure, from any provisions of bankruptcy law otherwise applicable, including, without limitation, any requirements that such compensation or reimbursement be allowed on a final basis after the filing of appropriate final fee applications, or (ii) as consent to the allowance of any fees and expenses referred to above; and shall not affect any right of the DIP Lender to object to the allowance, reasonableness, and/or payment of any such fees and expenses or amounts incurred or requested.<br><br>*See* Interim DIP Order ¶ 23. |
| **Covenants**<br>*Bankruptcy Rule 4001(c)(1)(B)* | <u>Affirmative Covenants:</u>  The Borrower covenants and agrees that, as of the date hereof until the termination of the DIP Term Sheet, unless the DIP Lender shall otherwise consent in writing, that the Borrower will, and will cause each of its subsidiaries to:<br><br>(i)    (a) Do or cause to be done all things necessary to preserve, renew, and keep in full force and effect its legal existence and (b) except where failure to do so would not reasonably be expected to have a material adverse effect, do or cause to be done all things necessary to (1) lawfully obtain, preserve, renew, extend, and keep in full force and effect the permits, franchises, authorizations, intellectual property, licenses and rights with respect thereto necessary to the normal conduct of its business and (2) at all times maintain, protect and preserve all property necessary to the normal conduct of its business and keep such property in good repair, working order and condition (ordinary wear and tear excepted), from time to time make, or cause to be made, all needful and proper repairs, renewals, additions, improvements and replacements thereto necessary in order that the business carried on in connection therewith, if any, may be properly conducted at all times.<br><br>(ii)    Comply with all laws, rules, regulations and orders of any governmental authority applicable to it or its property, except where the failure to do so, individually or in the aggregate, would not reasonably be expected to result in a material adverse effect.<br><br><u>Negative Covenants:</u>  The Borrower covenants and agrees that, as of the date hereof until the termination of the DIP Term Sheet, unless the DIP Lender shall otherwise consent in writing, the Borrower will not, and will not permit any of its subsidiaries to:<br><br>(i)    Incur, create, assume, or permit to exist any indebtedness for borrowed money except: (a) indebtedness created under the DIP Term Sheet, (b) indebtedness of the Borrower and its subsidiaries in existence prior to the date hereof, (c) indebtedness among the Borrower or its subsidiaries to the Borrower or its subsidiaries, and (d) the deferred purchase price of goods and services in the ordinary course of business.<br><br>(ii)    Create, incur, assume, or permit to exist any lien securing obligations for borrowed money of the Borrower or any Subsidiary, except (a) any liens created under |

| Bankruptcy Code / Rule | Summary of Material Terms[8] |
|---|---|
| | the Term Sheet and (b) liens on property or assets of the Borrower and its subsidiaries in existence prior to the date hereof. <br><br> (iii)    Purchase or otherwise acquire (a) all or substantially all of the property and assets or business of another person or (b) assets constituting a business unit, line of business or division of such person or otherwise make an investment in any person except (1) investments amongst the Borrower and its subsidiaries (2) investments in existence prior to the date hereof, and (3) the extension of trade credit in the ordinary course of business. <br><br> (iv)    Declare or pay any dividend or make any other distribution except for payments made by the Borrower and its subsidiaries to the Borrower or its subsidiaries. <br><br> (v)    Sell or transfer any property or assets to or purchase or acquire any property or assets from, or otherwise engage in any other transaction with any of its affiliates except for transactions that are on terms that are substantially no less favorable to the Borrower or such subsidiary, as applicable, than would be obtained in a comparable arm's-length transaction with a person that is not an affiliate. <br><br> (vi)    Enter into any arrangement, directly or indirectly, with any person whereby it shall sell or transfer any property, real or personal, used or useful in its business, whether now owned or hereafter acquired, and thereafter, as part of such transaction, rent or lease such property or other property that it intends to use for substantially the same purpose or purposes as the property being sold or transferred except sales or transfers of any property or assets that are worn out or obsolete in the ordinary course of business. <br><br> (vii)    Engage at any time to any material respect in any business or business activity substantially different from any business or business activity conducted by the Borrower and its subsidiaries on the date of the Interim Order. <br><br> Notwithstanding any of the Negative Covenants listed in this section, the Borrower shall be permitted to continue to operate its business in the ordinary course, including operating the Debtor and its Subsidiaries' receivables financing business. <br><br> *See* Interim DIP Order ¶ 6, 19, 29; DIP Term Sheet pp. 12-14. |
| **Use of DIP Financing Facility and Cash Collateral** <br> *Bankruptcy Rule 4001(b)(l)(B)(ii)* | The DIP Loans will be used strictly in accordance with the Approved Budget (subject to the Permitted Variances), for (i) working capital and general corporate purposes of the Borrower, (ii) for bankruptcy-related costs and expenses, and (iii) for costs and expenses related to the DIP Credit Facility. <br><br> *See* Interim DIP Order, ¶ 10; DIP Term Sheet p. 2. |
| **Events of Default** <br> *Bankruptcy Rule 4001(c)(1)(B); Local Bankruptcy Rule 4001-2(a)(i)(M)* | Each of following shall constitute an "Event of Default": <br><br> (i)    the entry of an Interim Order or Final Order in form or substance that is not acceptable to the DIP Lender in its discretion; <br><br> (ii)    failure by the Borrower to be in compliance in all material respects with provisions of the DIP Term Sheet and/or the DIP Orders; |

| Bankruptcy Code / Rule | Summary of Material Terms[8] |
|---|---|
| | (iii)     any request made by the Borrower for, or the reversal, modification, amendment, stay, reconsideration, or vacatur of a DIP Order, as entered by the Bankruptcy Court, without the prior written consent of the DIP Lender;<br><br>(iv)     failure of any representation or warranty to be true and correct in all material respects (or, to the extent qualified by materiality or Material Adverse Change, in all respects) when made;<br><br>(v)     the filing of any application by Borrower or any of its affiliates (other than the application for financing provided by a third party which seeks authority to pay all of the DIP Obligations in full upon entry of the order approving such financing) for the approval of (or an order is entered by the Bankruptcy Court approving) any claim arising under section 507(b) of the Bankruptcy Code or any other provision of the Bankruptcy Code or any security, mortgage, collateral interest, or other lien in the Chapter 11 Case which is *pari passu* with or senior to the DIP Liens, excluding liens arising under the DIP Orders, or pursuant to any other financing agreement made with the prior written consent of the DIP Lender;<br><br>(vi)     the commencement of any action by the Borrower or other authorized person (other than an action permitted by the DIP Orders) against the DIP Lender or any of its agents and employees to subordinate or avoid any liens made in connection with the DIP Orders;<br><br>(vii)     (a) the Borrower or any of its affiliates files a pleading in any court seeking or supporting an order to revoke, reverse, stay, vacate, amend, supplement, or otherwise modify any DIP Order or the DIP Term Sheet, or the disallowance of the DIP Obligations, in whole or in part or (b) any material provision of the DIP Orders or Term Sheet, or any other order of the Bankruptcy Court approving the Borrower's use of Cash Collateral (as defined in the DIP Orders), shall for any reason cease to be valid and binding (without the prior written consent of the DIP Lender);<br><br>(viii)     the filing with the Bankruptcy Court of a motion seeking approval of a sale under section 363 (other than as contemplated by the Sale Process) or a plan of reorganization or liquidation in the Chapter 11 Case that, in either case, does not provide for indefeasible payment in full in cash to the DIP Lender of DIP Loans and all other budgeted amounts outstanding under the DIP Term Sheet or the DIP Orders on closing of such sale or the effective date of such plan;<br><br>(ix)     the appointment in the Chapter 11 Case of a trustee, receiver, examiner, or responsible officer with enlarged powers relating to the operation of the business of the Borrower (powers beyond those set forth in sections 1106(a)(3) and (a)(4) of the Bankruptcy Code);<br><br>(x)     the granting of relief from the automatic stay by the Bankruptcy Court to any other creditor or party in interest in the Chapter 11 Case with respect to any portion of the DIP Collateral;<br><br>(xi)     the conversion of the Chapter 11 Case into a case pursuant to chapter 7 of the Bankruptcy Code;<br><br>(xii)     the termination of any of the Borrower's exclusive right to propose a plan of reorganization under chapter 11 of the Bankruptcy Code; |

| Bankruptcy Code / Rule | Summary of Material Terms[8] |
|---|---|
| | (xiii)    a dismissal of the Chapter 11 Case; |
| | (xiv)    failure to pay principal, interest, or other DIP Obligations in full when due, including without limitation, on the Maturity Date; |
| | (xv)    any representation or warranty expressly made by the Borrower in the DIP Term Sheet shall prove to have been false in a material respect when so made; and |
| | (xvi)    failure to comply with any covenant set forth herein and such failure shall remain unremedied for a period of five business days after written notice thereof to Borrower. |
| | *See* DIP Term Sheet pp. 14-16. |
| **Rights and Remedies Upon Event of Default**<br><br>*Local Bankruptcy Rule 4001-2(a)(i)(T)* | Upon an Event of Default, the DIP Lender shall be entitled to:<br><br>(i)    Declare that the DIP Commitment is terminated, whereupon the DIP Commitments shall be terminated;<br><br>(ii)    Declare the unpaid amount of the DIP Obligations to be immediately due and payable, without presentment, demand, protest or other notice of any kind, all of which are hereby expressly waived by the Borrower; or<br><br>(iii)    Take any other action or exercise any other right or remedy (including, without limitation, with respect to the liens in favor of the DIP Lender) permitted under the DIP Order, or by applicable law.<br><br>Any exercise of remedies by the DIP Lender shall be subject in all respects to the terms of the DIP Orders.<br><br>*See* Interim DIP Order ¶ 21; DIP Term Sheet p. 16. |
| **Milestones**<br>*Bankruptcy Rule 4001(c)(1)(B)(vi); Local Bankruptcy Rule 4001-2(a)(i)(H)* | None. |
| **Conditions to Closing**<br>*Bankruptcy Rule 4001(c)(1)(B); Local Bankruptcy Rule 4001-2(a)(i)(E)* | The obligations of the DIP Lender to make the Interim DIP Loans in accordance with the Draw Schedule will be subject to satisfaction, or written waiver, by the DIP Lender, of each of the following conditions precedent in connection with each draw request (the date on which such conditions shall have been satisfied or waived in accordance with the DIP Term Sheet, the ("<u>Interim Closing Date</u>").<br><br>(i)    Borrower shall have timely delivered to the DIP Lender the Approved Budget or any update thereto required to be delivered in accordance with the DIP Term Sheet;<br><br>(ii)    Borrower shall have delivered to the DIP Lender a Notice of Borrowing in connection with such draw request no later than 1:00 PM (Eastern Time) one day prior to the requested funding date for the Interim DIP Loan (or such later time as the DIP Lender may agree to);<br><br>(iii)    the Interim Order (in form and substance reasonably acceptable to the DIP Lender and consistent with the DIP Term Sheet) has been entered by the Bankruptcy |

| Bankruptcy Code / Rule | Summary of Material Terms[8] |
|---|---|
| | Court (after a hearing on notice to all parties having or asserting a lien on all or any portion of the DIP Collateral) and shall not have been reversed, modified, amended, stayed, or vacated, or in the case of any modification or amendment, in a manner without the consent of the DIP Lender and the Borrower shall be in compliance in all respects with the Interim Order;<br><br>(iv)    the Interim Order shall provide that the liens and security interests of the DIP Lender in the DIP Collateral have been perfected by the Interim Order and without the necessity of the execution of mortgages, security agreements, pledge agreements, financing statements, or other agreements and shall constitute first-priority liens (subject only to the Carve Out);<br><br>(v)    no Default or Event of Default under the DIP Credit Facility or under the Interim Order or Final Order, as applicable, shall have occurred and be continuing on the Interim Closing Date or after giving effect to the Interim DIP Loan;<br><br>(vi)    all representations and warranties of the Borrower under the DIP Term Sheet shall be true and correct in all material respects (except those qualified by materiality or Material Adverse Change (as defined below), which shall be true and correct in all respects);<br><br>(vii)    subject to Bankruptcy Court approval, (a) the Borrower shall have the corporate power and authority to make, deliver, and perform its obligations under the DIP Term Sheet and the Interim Order and (b) no consent or authorization of, or filing with, any person (including, without limitation, any governmental authority) shall be required in connection with the execution, delivery, or performance by the Borrower, or for the validity or enforceability in accordance with its terms against the Borrower, of the DIP Term Sheet and the Interim Order except for consents, authorizations, and filings which shall have been obtained or made and are in full force and effect and except for such consents, authorizations, and filings, the failure to obtain or perform, could not reasonably be expected to cause a Material Adverse Change (as defined below); and<br><br>(viii)    substantially concurrently with the Interim Closing Date, all budgeted fees and out-of-pocket expenses of the DIP Lender relating to the DIP Credit Facility (including, without limitation, reasonable fees and expenses of their counsel and external advisors) shall have been paid in full (or will be paid in connection with such Interim DIP Loan draw) to the extent an invoice has been delivered to the Borrower at least twenty-four (24) hours in advance.<br><br>Modifications of the Interim Order shall require the prior written consent of the DIP Lender.<br><br>For the purposes of the DIP Term Sheet, "Material Adverse Change" shall mean: after the Interim Order Entry Date, a material adverse change in, (a) the business, operations, properties, liabilities, or financial condition of Borrower and its subsidiaries, taken as a whole, (b) the ability of the Borrower to perform its obligations under the DIP Term Sheet, (c) the validity or enforceability against the Borrower of the DIP Term Sheet, or (d) the rights and remedies of the DIP Lender hereunder or thereunder.<br><br>*See* DIP Term Sheet pp. 8-10. |

| Bankruptcy Code / Rule | Summary of Material Terms[8] |
|---|---|
| **Conditions to Funding of Subsequent DIP Loans** *Bankruptcy Rule 4001(c)(1)(B); Local Bankruptcy Rule 4001-2(a)(i)(E)* | The obligations of the DIP Lender to make a Subsequent DIP Loans shall be subject to satisfaction or waiver of each of the following conditions:<br><br>(i)    the receipt by the DIP Lender of a Notice of Borrowing no later than 1:00 PM (Eastern Time) one (1) business days prior to the requested funding date for such Final DIP Loan;<br><br>(ii)    all representations and warranties being true and correct in all material respects (except those qualified by materiality or Material Adverse Change, which shall be true and correct in all respects);<br><br>(iii)    no Default or Event of Default under the DIP Credit Facility, or Interim Order or Final Order, as applicable, then existing or after giving effect to such Final DIP Loan; and<br><br>(iv)    the proceeds of such Subsequent DIP Loans shall be applied in a manner consistent with the Approved Budget and any Permitted Variances thereto, but nothing in the Interim DIP Order or other DIP Loan Documents shall restrict the Debtor from continuing to operate its business in the ordinary course, including its receivables financing business.<br><br>*See* Interim DIP Order ¶ 17; DIP Term Sheet p. 10. |
| **Stipulations to Prepetition Liens and Claims** *Bankruptcy Rule 4001(c)(1)(B)(iii); Local Bankruptcy Rule 4001-2(a)(i)(Q)* | None. |
| **Liens on Avoidance Actions** *Bankruptcy Rule 4001(c)(1)(B)(xi); Local Bankruptcy Rule 4001-2(a)(i)(U)* | The DIP Collateral does not include avoidance actions under chapter 5 of the Bankruptcy Code, provided that DIP Collateral shall include proceeds of avoidance actions upon entry of the Final Order.<br><br>*See* Interim DIP Order ¶ 5; DIP Term Sheet p. 5. |
| **Challenge Period** *Bankruptcy Rule 4001(c)(1)(B)(iii), (viii); Local Bankruptcy Rule 4001-2(a)(i)(Q)* | None. |
| **Waiver or Modification of the Automatic Stay** *Bankruptcy Rule 4001(c)(1)(B)(iv); Local Bankruptcy Rule 4001-2(a)(i)(S)* | The automatic stay of section 362 of the Bankruptcy Code shall be modified and vacated to the extent necessary to permit the Debtor and the DIP Lender to accomplish the transactions contemplated by the Interim Order and to permit DIP Lender to exercise remedies.<br><br>*See* Interim DIP Order ¶¶ 16, 21. |
| **Indemnification** *Bankruptcy Rule 4001(c)(1)(B)(ix)* | Borrower shall indemnify, pay, and hold harmless the DIP Lender (and each of their respective directors, officers, members, employees, and agents) against any loss, liability, cost, or expense incurred in respect of the financing contemplated hereby or the use or the proposed use of proceeds thereof (except to the extent resulting from the bad faith, gross negligence, willful misconduct, or fraud of the indemnified party, |

| Bankruptcy Code / Rule | Summary of Material Terms[8] |
|---|---|
|  | as determined by a final, non-appealable judgment of a court of competent jurisdiction).<br><br>*See* DIP Term Sheet p. 16.; Interim DIP Order¶ 27. |
| **Section 506(c) Waiver**<br>*Bankruptcy Rule 4001(c)(1)(B)(x); Local Bankruptcy Rule 4001-2(a)(i)(V)* | Subject to entry of the Final DIP Order (with the exception of the Interim Advance), and as a further condition of the DIP Loan Documents and any obligation of the DIP Lender to make credit extensions pursuant to the DIP Loan Documents (and the consent of the DIP Lender, to the payment of the Carve Out to the extent provided herein), no costs or expenses of administration of the Chapter 11 Case or any Successor Case shall be charged against or recovered from or against the DIP Lender with respect to the DIP Collateral, pursuant to section 105 or section 506(c) of the Bankruptcy Code or otherwise, without the prior written consent of the DIP Lender, and no such consent shall be implied from any other action, inaction, or acquiescence of the DIP Lender.<br><br>*See* Interim DIP Order, ¶ 31(a). |
| **Section 522(b) Waiver**<br>*Local Bankruptcy Rule 4001-2(a)(i)(W)* | None |
| **Marshaling**<br>*Local Bankruptcy Rule 4001-2(a)(i)(X)* | Subject to entry of the Final DIP Order, (with the exception of the Interim Advance) and as a further condition of the DIP Loan Documents and any obligation of the DIP Lender to make credit extensions pursuant to the DIP Loan Documents (and the consent of the DIP Lender, to the payment of the Carve Out to the extent provided herein), in no event shall the DIP Lender be subject to the equitable doctrine of "marshaling" or any similar doctrine with respect to the DIP Collateral or DIP Obligations, and all proceeds shall be received and applied in accordance with the Interim DIP Order and the DIP Term Sheet.<br><br>*See* Interim DIP Order, ¶ 31(b); |

## RELIEF REQUESTED AND BASIS THEREFOR

27.     By this Motion, the Debtor requests entry of the Interim DIP Order, in substantially the form attached hereto as **Exhibit A**: (i) authorizing the Debtor to obtain and enter into the DIP Financing and granting to the DIP Lender liens on the DIP Collateral securing the DIP Loans on a superpriority basis according to the priority set forth in the DIP Term Sheet; (ii) authorizing the Debtor to execute and deliver the DIP Term Sheet and to perform such other and further acts as may be necessary under the DIP Loan Documents; (iii) ordering that, subject to the Carve Out, all obligations of the Debtor to the DIP Lender under the DIP Loan Documents shall be entitled to

superpriority claim status under section 364(c)(1) of the Bankruptcy Code, with priority over all administrative expense claims and unsecured claims now existing or hereafter arising under the Bankruptcy Code; (iv) authorizing the Debtor's use of postpetition cash collateral pursuant to the terms and conditions set forth in the Interim DIP Order and the DIP Term Sheet; (v) modifying the automatic stay to the extent applicable and necessary to implement and effectuate the terms and provisions of the DIP Orders, as applicable; (vi) scheduling an interim hearing (the "Interim Hearing") to consider entry of this Interim DIP Order; (vii) scheduling a final hearing (the "Final Hearing") to consider entry (in form and substance acceptable to the DIP Lender) of the Final DIP Order granting the relief requested in the Motion on a final basis and approving the form of notice with respect to the Final Hearing and the transactions contemplated by the Motion; (viii) approving the Final DIP Order; and (ix) granting related relief.

28.     Due to Bank of America's refusal to comply with the Note Purchase Agreement, the Debtor has insufficient cash with which to properly administer its estate, operate its business, and proceed with the sale process beyond a few weeks from the filing of this Motion.  Thus, the Debtor needs the DIP Financing to maintain its business pending the closing of a sale in order to maximize the value of its assets for the benefit of all of its creditors.  The Debtor has negotiated with the DIP Lender to present this Motion on a consensual basis in order to achieve the highest value possible for creditors.

29.     The Debtor believes that, in its business judgment, entry into the DIP Term Sheet is in its best interests.  Provided that a debtor's business judgment does not run afoul of the provisions of, and policies underlying, the Bankruptcy Code, courts grant a debtor considerable deference in acting in accordance therewith.  *See, e.g., Trans World Airlines, Inc. v. Travellers Int'l AG. (In re Trans World Airlines, Inc.)*, 163 B.R. 964, 974 (Bankr. D. Del. 1994), *rev'd on*

*other grounds*, 134 F.3d 188 (3d Cir. 1998) (approving interim loan, receivables facility and asset-based facility based upon prudent business judgment of the debtor*); In re L.A. Dodgers LLC,* 457 B.R. 308, 313 (Bankr. D. Del. 2011) ("[C]ourts will almost always defer to the business judgment of a debtor in the selection of the lender."); *In re Ames Dep't Stores, Inc.,* 115 B.R. 34, 40 (Bankr. S.D.N.Y 19900) ("Cases consistently reflect that the court's discretion under section 364 is to be utilized on grounds that permit reasonable business judgment to be exercised so long as the financing agreement does not contain terms that leverage the bankruptcy process and powers or its purposed is not so much to benefit the estate as it is to benefit parties in interest.").  As such, the Court should authorize the Debtor to enter into the DIP Term Sheet.

**A.**    **The DIP Financing Should be Approved Under Section 364 of the Bankruptcy Code**

30.    Bankruptcy Code section 364(c) provides among other things, that if a debtor is unable to obtain unsecured credit allowable as an administrative expense, the court may authorize the debtor to obtain credit or incur debt (i) with priority over any and all administrative expenses, (ii) secured by a lien on property of the estate that is not otherwise subject to a lien, or (iii) secured by a junior lien on property of the estate that is subject to a lien. 11 U.S.C. § 264(c).

31.    Courts consider various factors in determining whether obtaining post-petition financing pursuant to section 364(c) is appropriate, including whether (1) the debtor is unable to obtain unsecured credit under section 364(b), *i.e.,* by allowing a lender only an administrative claim; (2) the credit transaction is necessary to preserve the assets of the estate; and (3) the terms of the transaction are fair, reasonable, and adequate under the circumstances. *See In re Los Angeles Dodgers LLC*, 457 B.R. 308, 312-13 (Bankr. D. Del. 2011) (noting these three factors in considering proposed post-petition financing) (citations omitted); *see also In re Farmland Indus., Inc.,* 294 B.R. 855, 879 (Bankr. W.D. Mo. 2003) (noting that courts look to various factors

including whether "the proposed financing is an exercise of sound and reasonable business judgment").

32.     In addition, section 364(d)(1) of the Bankruptcy Code provides that a court may authorize a debtor to incur post-petition debt on a senior or "priming" basis if (a) the debtor is unable to obtain credit otherwise and (b) there is "adequate protection of the interest of the holder of the lien on the property of the estate on which senior or equal lien is proposed to be granted." *See* 11 U.S.C. § 364(d)(1); *In re YL West 87th Holdings I LLC*, 423 B.R. 421, 441, (Bankr. S.D.N.Y. 2010).

### 1.    The Debtor is Unable to Obtain Unsecured Credit

33.     The Debtor urgently requires short-term working capital financing in order to preserve and maintain its business during the Chapter 11 Case.  Working on an extremely truncated timeline, the Debtor engaged with four parties that regularly provide postpetition financing in middle and lower middle market spaces, and only the DIP Lender submitted a binding proposal.

34.     The DIP Lender is unwilling to provide DIP Financing on an unsecured basis and the Debtor is unaware of any lender willing to provide financing on an unsecured basis.  As such, the Debtor has determined that they are unable to obtain critical post-petition financing on an unsecured basis.

### 2.    The Transaction Under the DIP Loan Documents is Necessary to Preserve the Estates and is in the Best Interests of Creditors

35.     The Debtor has insufficient cash with which to operate key portions of its business short-term or properly protect its assets.  Without access to post-petition financing, the Debtor will be unable to provide for the orderly sale and marshaling of its assets, which would significantly impair the value of the Debtor's assets and jeopardize the Debtor's ability to sell its assets to the detriment of all creditor constituencies.

36.     By obtaining the DIP Financing, the Debtor will be in a position to preserve the value of its assets during the Chapter 11 Case—specifically, the DIP Commitment will allow the to properly fund the Receivables Cycle and will provide the Debtor sufficient financial runway to market and sell its assets.

37.     Absent approval of the relief sought herein, the Debtor faces a substantial risk of irreparable damage to the value of its assets and the probability of conversion of the Chapter 11 Case to a case under chapter 7.  *See In re Sun Healthcare Group, Inc.,* 245 B.R. 779, 781 (Bankr. D. Del. 2000) (noting that the court had approved debtor-in-possession financing to "permit the Debtors to continue to operate to preserve their estates").  Accordingly, the Debtor needs sufficient liquidity to avoid a forced liquidation of its assets on a piece by piece "fire-sale" basis to the detriment of all creditors.

### 3.     The Terms of the DIP Financing are Fair and Reasonable.

38.     In determining whether the terms of post-petition financing are fair and reasonable, courts consider the relative circumstances of both the debtor and the potential lender.  *In re Farmland*, 294 B.R. at 886-89; *see also Unsecured Creditors' Comm. Mobil Oil Corp v. First Nat'l Bank & Trust Co. (In re Ellingsen MacLean Oil Co., Inc.),* 65 B.R. 358, 364-65 n.7 (W.D. Mich. 1986) (recognizing a debtor may have to enter into "hard" bargains to acquire funds for its reorganization).

39.     Under the circumstances of this case, including the Debtor's unsustainable financial condition, and the lack of readily available financing, the terms of the DIP Financing are fair and reasonable.  First, the terms and conditions of the DIP Term Sheet were negotiated by the parties in good faith and at arms' length and were instituted for the purposes of enabling the Debtor to meet ongoing operational expenses while in chapter 11 and preserving the value of the Debtor's

assets.  Second, the terms themselves are reasonable and favorable to the Debtor.  The fees for the

DIP Financing are reasonable, and the interest rate is favorable to the Debtor based on the current

prime rate, which has risen significantly in recent years.

40.    Furthermore, the DIP Financing subjects the security interests and administrative

expense claims granted to the DIP Lender to the Carve Out for certain administrative and

professionals fees, including (i) fees required to be paid to the Court and to the United States

Trustee, and (ii) the reasonable fees and expenses incurred by the professionals of the Debtor,

subject to the Approved Budget.  Carve Outs for professional fees have been found to be

reasonable and necessary to ensure that statutory creditors' committees and debtors' estates are

adequately assisted by counsel and other professionals.  *See In re Ames*, 115 B.R. at 38.

Accordingly, the terms of the DIP Financing are fair and reasonable.

41.    As such, the DIP Financing should be approved under section 364(c) of the

Bankruptcy Code.

**B.    The DIP Financing Was Negotiated in Good Faith and Should be Afforded the Protection of Section 364(e) of the Bankruptcy Code**

42.    Pursuant to section 364(e) of the Bankruptcy Code, any reversal or modification on

appeal of an authorization to obtain credit or incur debt or a grant of priority or a lien under section

364 of the Bankruptcy Code shall not affect the validity of that debt incurred or priority of lien

granted as long as the entity that extended credit "extended such credit in good faith."  *See* 11

U.S.C. § 364(e).

43.    Courts generally hold that "good faith" in the context of post-petition financing

means, consistent with the Uniform Commercial Code, honesty in fact in the conduct or transaction

concerned.  *See Unsecured Creditors' Comm. v. First Nat'l Bank & Trust Co.* (*In re Ellingsen*

*MacLean Oil Co.*), 834 F.2d 599, 605 (6th Cir. 1987) (citing U.C.C. § 1-201(19)).  Additionally,

"[g]ood faith is measured with respect to the good faith of the lender as contrasted to that of the borrower." *In re Lynondell Chem. Co.,* No. 09-10023 (Bankr. S.D.N.Y. Mar. 5, 2009). Moreover, a lender's desire to ensure that is repaid, to make money on interest and fees and to protect pre-petition positions are understandable and acceptable motivations for a post-petition lender in negotiating a deal. *Id.*

44.     The terms of the DIP Financing were negotiated at arm's length and reflect the most advantageous terms available to the Debtor in light of the exigent circumstances it faces. The DIP Financing is being extended by the DIP Lender in good faith (as such term is used in section 364(e) of the Bankruptcy Code). No consideration is being provided to any party to the DIP Loans, other than as set forth herein and in the Interim DIP Order. As such, the DIP Lender should be entitled to the full protection of section 364(e) of the Bankruptcy Code in the event that the Interim DIP Order or any provision thereof is vacated, reversed, or modified on appeal or otherwise.

### C.     The Automatic Stay Should be Modified on a Limited Basis

45.     The relief requested herein contemplates a modification of the automatic stay (to the extent applicable) to permit the Debtor to grant the security interests, liens, and super-priority claims described above and to perform such acts as may be requested to assure the perfection and priority of such security interests and liens. Stay modification provisions of this sort are ordinary and usual features of debtor-in-possession financing facilities and are reasonable under certain circumstances.

46.     The Debtor further requests that, upon the occurrence of an Event of Default under the DIP Term Sheet, the automatic stay shall terminate to permit the DIP Lender to exercise all rights and remedies under the DIP Loan Documents, as applicable, without further action or order of the Bankruptcy Court. Following an Event of Default, the DIP Lender may, among other things,

deliver a written notice to counsel for the Debtor and the U.S. Trustee (the "<u>Remedies Notice</u>")

declaring the occurrence of a DIP Termination Event (such date, the "<u>DIP Termination Declaration</u>

<u>Date</u>").  During the seven (7) days following the DIP Termination Declaration Date (the "<u>Waiting</u>

<u>Period</u>"), the Debtor may seek an emergency hearing to contest the DIP Lender's attempted

termination.  During the Waiting Period, the Debtor may continue to use DIP Collateral (including

Cash Collateral) in accordance with the terms of the Interim DIP Order and the DIP Loan

Documents, solely to pay any expenses which are necessary to (a) preserve the Debtor's going-

concern value or (b) contest in good faith the occurrence of the Maturity Date or Event of Default.

The DIP Lender may not object to a motion of the Debtor seeking an emergency hearing during

the Waiting Period or seek to reduce the Waiting Period.  Such relief is an appropriate balance,

providing the DIP Lender with the ability to exercise its rights upon the Debtor's Event of Default

without having to seek further relief from the Court, while simultaneously providing the Debtor

with notice and the opportunity to seek reinstatement of the automatic stay.

**D.     Approval of the DIP Financing on an Interim Basis is Necessary to Prevent Immediate and Irreparable Harm**

47.     Rule 4001(c)(2) of the Bankruptcy Rules governs the procedures for obtaining

authorization to obtain post-petition financing and provides, in relevant part:

> The court may commence a final hearing on a motion for authority to obtain
> credit no earlier than 14 days after service of the motion. If the motion so
> requests, the court may conduct a hearing before such 14-day period
> expires, but the court may authorize the obtaining of credit only to the extent
> necessary to avoid immediate and irreparable harm to the estate pending a
> final hearing.

Fed. R. Bankr. P. 4001(c)(2).  "Immediate and irreparable harm" exists where loss of the business

threatens the ability of the debtor to reorganize." *See In re Ames*, 115 B.R. at 36 n.2.  Approval of

a DIP facility on an interim basis under Rule 4001(c)(2) is left to the discretion of the court as

informed by the facts of each case. *See In re Pan Am Corp.*, 1992 WL 154200 *1, *6 (S.D.N.Y. June 18, 1992).

48.    Absent authorization from this Court to obtain secured credit, as requested, on an interim basis pending the Final Hearing, the Debtor will be immediately and irreparably harmed. The Debtor does not have cash sufficient to meet its immediate cash needs.  The Debtor needs to obtain immediate access to liquidity under the DIP Financing in order to, among other things, continue the operation of the Money To Run Your School business line, which funds payroll obligations for teachers and staff at myriad charter schools, and to satisfy other working capital and operational needs.  Thus, the credit provided under the DIP Financing will enable the Debtor to continue to operate its business in an orderly and reasonable manner to preserve and enhance the value of its estate for the benefit of all parties in interest.

49.    The availability of interim funding under the DIP Term Sheet will also provide necessary assurance of the Debtor's ability to meet its short-term obligations and work toward a streamlined sale process that will maximize value for the Debtor's estate.  Failure to meet these obligations and to demonstrate progress toward a sale will cause creditors, potential acquirers, and contract counterparties to lose confidence in the Debtor, thereby causing irreparable harm to the value of the Debtor's business and assets.

50.    Accordingly, the interim relief requested is critical to preserving and maintaining the going concern value of the Debtor's assets for a sale of those assets for the benefit of all parties. As such, the Debtor believes that, under the circumstances, entry of the Interim DIP Order is necessary to prevent immediate and irreparable harm to the estates and therefore is warranted under the requirements of Bankruptcy Rule 4001(c)(2).

**E.**   **Request for a Final Hearing**

51.     Pursuant to Rule 4001(c)(2) of the Bankruptcy Rules, the Debtor requests that the Court set a date which is no sooner than fourteen (14) days after the date of this Motion and no later than thirty (30) days after the entry of the Interim Order to hold a hearing to consider entry of the Final Order and the permanent approval of the relief requested in this Motion.

## REQUEST FOR RELIEF UNDER BANKRUPTCY RULE 6004(b)

52.     Bankruptcy Rule 6004(h) provides that an "order authorizing the use, sale, or lease of property . . . . is stayed until the expiration of 14 days after entry of the order, unless the court orders otherwise." Fed. R. Bankr. P. 6004(h).  Given the nature of the relief requested herein, the Debtor respectfully requests a waiver of the 14-day stay under Bankruptcy Rule 6004(h) so that the Interim DIP Order may be effective immediately.  As set forth above, the Debtor needs immediate access to funding under the DIP Financing in order to prevent irreparable damage to the Debtor's business and to preserve the value of its assets.  Accordingly, the Debtor submits that ample cause exists to justify a waiver of the 14-day stay imposed by Bankruptcy Rule 6004(h).

## NOTICE

53.     Notice of the Motion will be provided to the following parties: (a) the Office of the United States Trustee for the District of Delaware; (b) the twenty (20) largest unsecured creditors of the Debtor; (c) the DIP Lender; (d) all other parties asserting a lien on or a security interest in the assets of the Debtor to the extent reasonably known to the Debtor; (e) the Internal Revenue Service; (f) the United States Attorney's Office for the District of Delaware; (g) the state attorneys general for all states in which the Debtor conducts business; and (h) any party that has requested notice pursuant to Bankruptcy Rule 2002.

54.     Under the circumstances and given the nature of the relief sought in the Motion, the Debtor believes such notice constitutes due, sufficient and appropriate notice and complies with section 102(1) of the Bankruptcy Code, Bankruptcy Rules 2002 and 4001(b) and (c) and Local Rules 2002-1 and 4001-2.

55.     Thus, the Debtor believes no further notice is necessary, and the that the form, scope and timing of notice of the Motion were adequate and sufficient under the circumstances.

*[Remainder of page intentionally left blank]*

WHEREFORE, the Debtor respectfully requests that this Court enter the Interim DIP Order, substantially in the form attached hereto as **Exhibit A**, and grant such other and further relief as this Court deems appropriate.

Dated: June 29, 2025  
Wilmington, Delaware

POTTER ANDERSON & CORROON LLP

*/s/ Aaron H. Stulman*  
Aaron H. Stulman (No. 5807)  
Brett M. Haywood (No. 6166)  
James R. Risener III (No. 7334)  
Ethan H. Sulik (No. 7270)  
1313 North Market Street, 6th Floor  
Wilmington, Delaware 19801  
Tel: (302) 984-6000  
Facsimile: (302) 658-1192  
Email: astulman@potteranderson.com  
   bhaywood@potteranderson.com  
   jrisener@potteranderson.com  
   esulik@potteranderson.com

- and -

GOODWIN PROCTER LLP  
Howard S. Steel (admitted *pro hac vice*)  
Stacy Dasaro (admitted *pro hac vice*)  
Kizzy L. Jarashow (admitted *pro hac vice*)  
James Lathrop (admitted *pro hac vice*)  
The New York Times Building  
620 Eighth Avenue  
New York, New York 10018-1405  
Tel: (212) 813-8800  
Facsimile: (212) 355-3333  
Email: hsteel@goodwinlaw.com  
   sdasaro@goodwinlaw.com  
   kjarashow@goodwinlaw.com  
   jlathrop@goodwinlaw.com

*Proposed Counsel for Debtor and Debtor-in-Possession*