**<u>EXHIBIT A</u>**

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | Chapter 11 |
| Charter School Capital, Inc.,[1] | Case No. 25-11016 (CTG) |
| Debtor. | **Re: Docket No. __** |

### INTERIM ORDER (I) AUTHORIZING THE DEBTOR TO OBTAIN POSTPETITION FINANCING; (II) GRANTING LIENS AND PROVIDING SUPERPRIORITY ADMINISTRATIVE EXPENSE STATUS; (III) AUTHORIZING USE OF CASH COLLATERAL; (IV) MODIFYING THE AUTOMATIC STAY; (V) <u>SCHEDULING A FINAL HEARING; AND (VI) GRANTING RELATED RELIEF</u>

Upon the motion (the "**Motion**") of Charter School Capital, Inc., as debtor and debtor-in-possession (the "**Debtor**") in the above-captioned chapter 11 case (the "**Chapter 11 Case**"), seeking entry of an interim order (this "**Interim Order**") and a final order (the "**Proposed Final Order**"), pursuant to sections 105, 361, 362, 363, 364, 503, 506, and 507 of title 11 of the United States Code, 11 U.S.C. §§ 101–1532 (the "**Bankruptcy Code**"), Rules 2002, 4001, 6003, 6004, and 9014 of the Federal Rules of Bankruptcy Procedure (the "**Bankruptcy Rules**"), and Rule 2002-1, 4001-2, and 9013-1 of the Local Rules of Bankruptcy Practice and Procedure of the United States Bankruptcy Court for the District of Delaware (the "**Local Rules**"), that, among other things:

i.        authorizes the Debtor to obtain postpetition financing on a senior secured superpriority basis, consisting of a new money term loan facility (the "**DIP Facility**," and the loans issued thereunder, the "**DIP Loans**") in an aggregate principal amount of up to $5,000,000 (the "**DIP Loan Commitment**"), consisting of (x) upon entry of this Interim Order and satisfaction or

---

[1]    The Debtor's mailing address is 9450 SW Gemini Dr, PMB 559064, Beaverton, OR 97008-7105, and the last four digits of the Debtor's federal tax identification number are 4278.

waiver of the borrowing conditions set forth in the DIP Term Sheet (as defined below), $2,500,000 made available to the Debtor and may be drawn in a single draw on the Closing Date (the "Interim Advance"), and (y) subject to entry of the Proposed Final Order, any amounts above the Interim Advance made available to the Debtor subject to the terms of and conditions, and in the amount set forth in the Senior Secured Superpriority Debtor-in-Possession Credit Facility Term Sheet (as amended, restated, supplemented or otherwise modified from time to time in accordance with the terms thereof, (the "**DIP Term Sheet**")[2] attached hereto as **Exhibit 2** and, together with any ancillary, collateral or related documents and agreements, (inclusive of the DIP Term Sheet, the "**DIP Loan Documents**")), among the Debtor, as Borrower, and East West Bank, as Lender (the "**DIP Lender**");

ii.      approves the terms of the DIP Term Sheet, and authorizes the Debtor, on an interim basis, to execute, deliver, and perform under the DIP Term Sheet, the DIP Loan Documents, and all other credit documentation relating to the DIP Facility, including, without limitation, as applicable, security agreements, pledge agreements, debentures, mortgages, control agreements, deeds, charges, guarantees, promissory notes, intercompany notes, certificates, instruments, intellectual property security agreements, notes, fee letters, and such other documents that are ancillary or incidental thereto or that may be reasonably requested by the DIP Lender in connection with the DIP Facility, in each case, as amended, restated, supplemented, waived or otherwise modified from time to time in accordance with the terms thereof and hereof;

iii.      authorizes the Debtor, on an interim basis, to issue, incur and guarantee all loans, notes, advances, extensions of credit, financial accommodations, reimbursement obligations, fees and premiums (including, without limitation, the Upfront Fee, the Exit Fee, and any other fees

---

[2]      Unless stated otherwise, capitalized terms used but not otherwise defined herein shall have the meanings ascribed to them in the DIP Term Sheet.

ACTIVE/201263025.8

payable pursuant to the DIP Term Sheet and/or DIP Loan Documents), costs, expenses and other liabilities and all other obligations (including indemnities and similar obligations, whether contingent or absolute) due or payable to or for the benefit of the DIP Lender under the DIP Term Sheet and/or the DIP Loan Documents (collectively, the "**DIP Obligations**"), and to perform such other and further acts as may be required, necessary, desirable, or appropriate in connection therewith;

iv.    authorizes the Debtor to perform such other and further acts as may be necessary or desirable in connection with this Interim Order, the DIP Term Sheet, the DIP Loan Documents and the transactions contemplated hereby and thereby;

v.    authorizes and directs the Debtor, on an interim basis, to use the proceeds of the DIP Facility and Cash Collateral in accordance with the DIP Term Sheet and/or the DIP Loan Documents to (a) fund the postpetition working capital needs of the Debtor pending the Final Hearing, (b) pay fees, costs and expenses of the DIP Facility on the terms and conditions described in this Interim Order, the DIP Term Sheet and/or the DIP Loan Documents, and (c) pay the allowed administrative costs and expenses of the Chapter 11 Case, in each case, solely in accordance with the DIP Term Sheet, the DIP Budget (as defined below), and this Interim Order;

vi.    authorizes the Debtor to grant to the DIP Lender valid, enforceable, non-avoidable, automatically, and fully perfected security interests, liens, and superpriority claims, including allowed superpriority administrative expense claims, pursuant to sections 364(c)(1) and 507(b) of the Bankruptcy Code and liens pursuant to sections 364(c)(2), 364(c)(3), and 364(d)(1) of the Bankruptcy Code in the Collateral (as defined below) (and all proceeds thereof), including, without limitation, all property constituting "Cash Collateral," as defined in section 363(a) of the

Bankruptcy Code, ("**Cash Collateral**"), to secure all DIP Obligations, subject only to the Carve Out;

vii.    authority for the DIP Lender to take all commercially reasonable actions to implement and effectuate the terms of this Interim Order and the DIP Term Sheet;

viii.    authorizes payment of the DIP Fees (as defined below);

ix.    authorizes the Debtor to waive, as to the DIP Lender, subject to and pending entry of the Final Order, all of the Debtor's rights to surcharge against the DIP Collateral, pursuant to section 506(c) of the Bankruptcy Code;

x.    subject to entry of the Final Order, determination that the equitable doctrine of marshaling or any other similar doctrine shall not apply with respect to any collateral of the DIP Lender;

xi.    modification of the automatic stay provided by section 362(a) of the Bankruptcy Code to the extent set forth herein and as necessary to permit the DIP Lender to implement and effectuate the terms and provisions of the DIP Term Sheet and/or the DIP Loan Documents, including, upon entry, the Interim Order, and, subject to the terms of the DIP Term Sheet and DIP Loan Documents (including this Interim Order), to deliver any Carve Out Trigger Notice (as defined herein) or other notices in relation thereto and the exercise of certain rights and remedies, as contemplated hereby and by the DIP Term Sheet and other DIP Loan Documents;

xii.    waiver of any applicable stay (including under Bankruptcy Rule 6004) and providing for immediate effectiveness of this Interim Order; and

xiii.    schedules a final hearing (the "**Final Hearing**") to consider final approval of the DIP Facility pursuant to the Proposed Final Order, as set forth in the Motion and the DIP Term Sheet.

ACTIVE/201263025.8

This Court, having considered the Motion, the DIP Term Sheet, the proposed Interim Order, the *Declaration of Brian Ayers in Support of Debtor's Motion for Entry of Interim and Final Orders (I) Authorizing the Debtor to Obtain Postpetition Financing; (II) Granting Liens and Providing Superpriority Administrative Expense Status; (III) Authorizing Use of Cash Collateral; (IV) Modifying the Automatic Stay; (V) Scheduling a Final Hearing; and (VI) Granting Related Relief* (the "**DIP Declaration**"), the papers filed with this Court, the evidence submitted and arguments proffered or adduced at the hearing held before this Court on July 2, 2025 (the "**Interim Hearing**"), and upon the record of the Chapter 11 Case; and adequate notice of the Interim Hearing having been given in accordance with Bankruptcy Rules 2002, 4001 and 9014 and all applicable Local Rules; and it appearing that no other or further notice need be provided; and all objections, responses and reservations of rights with respect to the entry of this Interim Order, if any, having been withdrawn, resolved, or overruled by this Court; and it appearing to this Court that extraordinary circumstances exist and that granting the interim relief requested in the Motion is necessary to avoid immediate and irreparable harm to the Debtor and its estate pending the Final Hearing, and otherwise is fair and reasonable and in the best interests of the Debtor, its estate, creditors, and other parties in interest, and is essential for the continued operation of the Debtor's businesses and the preservation of the value of the Debtor's assets and represents a sound exercise of the Debtor's business judgment; and after due deliberation and consideration, and for good and sufficient cause appearing therefor,

ACTIVE/201263025.8

**THIS COURT HEREBY MAKES THE FOLLOWING FINDINGS OF FACT AND CONCLUSIONS OF LAW BASED UPON THE MOTION, THE REPRESENTATIONS OF COUNSEL AND EVIDENCE SUBMITTED DURING THE INTERIM HEARING**:[3]

a.      **Petition Date**.  On June 8, 2025 (the "**Petition Date**"), the Debtor filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code in this Court commencing this Chapter 11 Case.

b.      **Debtor in Possession**.  The Debtor is operating its businesses and managing its properties as a debtor in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code. To date, the Office of the United States Trustee for the District of Delaware (the "**U.S. Trustee**") has not appointed an official committee of unsecured creditors in the Chapter 11 Case pursuant to section 1102 of the Bankruptcy Code (a "**Creditors' Committee**") and no request has been made for the appointment of a trustee or an examiner.

c.      **Jurisdiction and Venue**.  This Court has core jurisdiction over the Chapter 11 Case, the Motion and the parties and property affected hereby pursuant to 28 U.S.C. §§ 157 and 1334.  Venue is proper before this Court pursuant to 28 U.S.C. §§ 1408 and 1409.  The bases for relief sought in this Motion are sections 105, 361, 362, 363, 364, 503, 506, and 507 of the Bankruptcy Code, Bankruptcy Rules 2002, 4001, 6003, 6004 and 9014, and Local Rules 2002-1, 4001-2, and 9013-1.

d.      **Notice**.  Under the circumstances, the notice given by the Debtor of, and as described in, the Motion, the relief requested therein, and the Interim Hearing constitutes proper

---

[3]    The findings and conclusions set forth herein constitute this Court's findings of fact and conclusions of law pursuant to Bankruptcy Rule 7052, made applicable to this proceeding pursuant to Bankruptcy Rule 9014, and shall take effect and be fully enforceable effective as of the Petition Date immediately upon entry hereof.  To the extent that any of the following findings of fact constitute conclusions of law, they are adopted as such.  To the extent any of the following conclusions of law constitute findings of fact, they are adopted as such.

ACTIVE/201263025.8

notice thereof and complies with Bankruptcy Rules 2002, 4001(b), (c) and (d), and 9014 and the Local Rules, and no further notice of the relief sought at the Interim Hearing and the relief granted herein is necessary or required.  The interim relief granted herein is necessary to avoid immediate and irreparable harm to the Debtor and its estate, creditors, and other parties in interest, pending the Final Hearing.

       e.       **No Credit Available on More Favorable Terms**.  The DIP Facility is the best source of debtor-in-possession financing available to the Debtor.  Given its current financial condition, financing arrangements, and capital structure, and the circumstances of the Chapter 11 Case, the Debtor has been and continue to be unable to obtain financing from sources other than the DIP Lender on terms more favorable than the DIP Facility.  The Debtor is unable to procure financing in the form of unsecured credit allowable as an administrative expense under sections 364(a), 364(b), or 503(b)(1) of the Bankruptcy Code.  The Debtor is also unable to obtain secured credit without granting to the DIP Lender the DIP Liens and the DIP Superpriority Claims (each as defined herein), to the extent set forth herein and under the terms and conditions set forth in the DIP Term Sheet and/or the DIP Loan Documents, in each case subject and subordinate to the Carve Out, and has been unable to procure the necessary financing on terms more favorable, taken as a whole, than the financing offered by DIP Lender pursuant to the DIP Term Sheet and/or the DIP Loan Documents.

       f.       **Best Interests of Estate**.  It is in the best interests of the Debtor's estate and creditors that the Debtor be allowed to obtain postpetition secured financing from the DIP Lender under the terms and conditions set forth herein and in the DIP Term Sheet and/or the DIP Loan Documents, as such financing is necessary to avoid immediate and irreparable harm to the Debtor's estate and for the continued operation of the Debtor's businesses.

ACTIVE/201263025.8

g. **Good Faith**. Based upon the papers filed in this Chapter 11 Case and the proceedings of record in this Chapter 11 Case, (a) the extension of credit and financial accommodations under the DIP Term Sheet and/or the DIP Loan Documents are fair, reasonable, in good faith, negotiated at arm's length, reflect the Debtor's exercise of prudent business judgment consistent with their fiduciary duties, and are supported by reasonably equivalent value and fair consideration; (b) the terms and conditions of the DIP Facility and the use of the Cash Collateral have been negotiated in good faith and at arm's-length among the Debtor and the DIP Lender, with the assistance and counsel of their respective advisors; (c) the use of Cash Collateral, including, without limitation, pursuant to this Interim Order, has been allowed in "good faith" within the meaning of section 364(e) of the Bankruptcy Code; (d) any credit to be extended, loans to be made, and other financial accommodations to be extended to the Debtor by the DIP Lender, including, without limitation, pursuant to this Interim Order, have been allowed, advanced, extended, issued, or made, as the case may be, in "good faith" within the meaning of section 364(e) of the Bankruptcy Code by the DIP Lender in express reliance upon the protections offered by section 364(e) of the Bankruptcy Code; (e) the liens, claims, and other covenants and payments as set forth in this Interim Order and the DIP Term Sheet, as well as the protections afforded parties acting in "good faith" under section 364(e) of the Bankruptcy Code are integral, critical and essential components of the DIP Facility provided by the DIP Lender to the Debtor; and (e) the DIP Facility, the DIP Liens (as defined below), and the DIP Superpriority Claims (as defined below) shall be entitled to the full protection of section 364(e) of the Bankruptcy Code in the event that this Interim Order or any provision hereof is vacated, reversed, or modified, on appeal or otherwise. Accordingly, the DIP Lender is entitled to the protections of section 364(e) of the Bankruptcy Code.

ACTIVE/201263025.8

h.      **Good Cause**.  Good cause has been shown for immediate entry of this Interim Order, and the entry of this Interim Order is in the best interests of the Debtor, its estate, and its stakeholders.  Among other things, the Debtor has an immediate need for the liquidity provided by the DIP Facility on an interim basis and interim use of Cash Collateral in order to avoid immediate, irreparable harm, and the relief granted herein will minimize disruption of the Debtor's business in order to maximize value through the sale process and permit the Debtor to pay critical expenses necessary to maximize the value of its estate.  The interim relief requested in the Motion is necessary, essential and appropriate, and is in the best interest of and will benefit the Debtor, its creditors and its estate, as its implementation will, among other things, provide the Debtor with the necessary liquidity to (1) minimize disruption to the Debtor's businesses and ongoing operations, (2) preserve and maximize the value of the Debtor's estate for the benefit of all the Debtor's creditors, and (3) avoid potential immediate and irreparable harm to the Debtor, its creditors, its businesses, its employees, the schools it serves, and its assets.

i.      **Necessity of DIP Facility Terms**.  The terms of this Interim Order, the DIP Term Sheet, and/or the DIP Loan Documents assuring that the liens and the various claims, superpriority claims, and other protections granted in this Interim Order will not be affected by any subsequent reversal or modification, as provided in section 364(e) of the Bankruptcy Code, which is applicable to the postpetition financing arrangement contemplated in the DIP Term Sheet and/or the DIP Loan Documents, are necessary in order to induce the DIP Lender to provide postpetition financing to the Debtor.

j.      **Immediate Need for Postpetition Financing and Use of Cash Collateral**.  The Debtor has an immediate and critical need to obtain financing pursuant to this Interim Order, the DIP Term Sheet, and/or the DIP Loan Documents in order to, among other things, (a) pay the fees,

ACTIVE/201263025.8

costs, and expenses incurred in connection with the Chapter 11 Case, (b) fund any obligations benefitting from the Carve Out, (c) permit the orderly continuation of the operation of the Debtor's businesses, including its receivables financing business (d) maintain business relationships with schools, customers, vendors, and suppliers, (e) make payroll, and (f) satisfy other working capital and operational needs.  The incurrence of new debt under this DIP Order, the DIP Term Sheet, and/or the DIP Loan Documents and use of Cash Collateral is in the best interest of the Debtor's estate and necessary and vital to the preservation and maintenance of the going concern value of the Debtor.  Immediate and irreparable harm will be caused to the Debtor and its estate if immediate financing is not obtained and permission to use Cash Collateral is not granted.  The extensions of credit under this Interim Order, the DIP Term Sheet, and/or the DIP Loan Documents are fair and reasonable, and the Debtor's entry into the DIP Facility reflects the Debtor's exercise of prudent business judgment and is supported by reasonably equivalent value and fair consideration.

k.       **Willingness to Provide Financing**.  The DIP Lender has committed to provide financing to the Debtor subject to: (a) entry of this Interim Order and the Final Order; (b) approval of the terms and conditions of the DIP Term Sheet, the DIP Facility, and those set forth in the DIP Loan Documents; (c) satisfaction of the closing conditions set forth in the DIP Loan Documents; and (d) findings by this Court that the DIP Facility is essential to the Debtor's estate, that the DIP Lender is extending credit to the Debtor pursuant to this Interim Order, the DIP Term Sheet, and/or the DIP Loan Documents in good faith, and that the DIP Lender's claims, superpriority claims, security interests and liens and other protections granted pursuant to this Interim Order, the DIP Term Sheet, and/or the DIP Loan Documents will have the protections provided by section 364(e) of the Bankruptcy Code.

ACTIVE/201263025.8

l.      **DIP Budget**.  The Debtor has prepared and delivered to the DIP Lender and its advisors an initial budget attached hereto as **Exhibit 1** (together with any additional line-item or other detail and supplements as may be provided pursuant to the terms of the DIP Term Sheet, the "**Initial DIP Budget**").  The Initial DIP Budget reflects, among other things, the Debtor's projected operating receipts, operating disbursements, non-operating disbursements, net operating cash flow and liquidity for each one-week period covered thereby.  The Initial DIP Budget may be modified, amended, extended, and updated from time to time in accordance with the DIP Term Sheet and/or DIP Loan Documents, and such modified, amended, extended and/or updated budget, once approved (or deemed approved) by the Debtor and the DIP Lender, shall modify, replace, supplement or supersede, as applicable, the Initial DIP Budget for the periods covered thereby (the Initial DIP Budget and each subsequent approved budget (including any additional line-item or other detail and supplements as may be provided pursuant to the terms of the DIP Term Sheet and/or DIP Loan Documents) shall constitute, without duplication, an "**Approved Budget**"). Upon request, each subsequent Approved Budget (as approved in accordance with the DIP Term Sheet and this Interim Order) shall be provided to the U.S. Trustee in summary form.  The Initial DIP Budget has been reviewed by the Debtor, its management, and its advisors, and the Debtor believes that the Initial DIP Budget is reasonable under the circumstances.  The DIP Lender is relying, in part, upon the Debtor's agreement to comply with the Approved Budget (subject only to Permitted Variances) and the terms of the DIP Term Sheet in determining to enter into the DIP Facility and to consent to the use of Cash Collateral provided for in this Interim Order.

m.      **Extraordinary Circumstances**.  Extraordinary circumstances exist within the meaning of Local Rule 4001–2(b) as set forth in the Motion and at the Interim Hearing to the extent necessary to justify the relief set forth in this Interim Order.

-11-

n.     **Use of Proceeds of DIP Facility**.  As a condition to the Debtor's entry into the DIP Term Sheet and/or the DIP Loan Documents, the extension of credit under the DIP Facility, the Debtor has agreed that the proceeds of the DIP Facility shall be used solely in accordance with the terms and conditions of this Interim Order, the DIP Term Sheet and/or DIP Loan Documents, and the Approved Budget (subject to Permitted Variances).

o.     **Sections 506(c) and Marshaling**.  In light of the DIP Lenders' agreement that its liens and superpriority claims shall be subject to payment of the Carve Out, the DIP Lender has negotiated for, and the Debtor intends to seek in the Final Order, (a) a waiver of the equitable doctrine of "marshaling" or any similar doctrine with respect to the DIP Collateral and the DIP Obligations, and (b) a waiver of the provisions of section 506(c) of the Bankruptcy Code with respect to the collateral of the DIP Lender.

p.     **Business Judgment**.  Based on the Motion, the DIP Declaration, and the record presented to this Court at the Interim Hearing, (i) the terms of the financing embodied in the DIP Loan Documents, including the fees, expenses, and other charges paid and to be paid thereunder or in connection therewith, and (ii) the terms on which the Debtor may use the proceeds of the DIP Facility and the DIP Collateral (including Cash Collateral), in each case pursuant to this Interim Order and the DIP Loan Documents, are fair and reasonable, reflect the Debtor's exercise of prudent business judgment consistent with its fiduciary duties, constitute reasonably equivalent value and fair consideration, and represent the best financing and terms available under the circumstances.

q.     **Immediate Entry**.  Sufficient cause exists for immediate entry of this Interim Order pursuant to Bankruptcy Rules 4001(b)(2) and 4001(c)(2) and the applicable Local Rules.

NOW, THEREFORE, based upon the foregoing findings and conclusions, the Motion and the record before this Court with respect to the Motion, and after due consideration and good and sufficient cause appearing therefor,

**IT IS HEREBY ORDERED THAT:**

1. **Motion Granted**. Entry into the DIP Term Sheet and other DIP Loan Documents is authorized and approved, and the use of Cash Collateral on an interim basis is authorized, in each case, subject to the terms and conditions set forth in this Interim Order and in the DIP Loan Documents, including but not limited to the Approved Budget (subject to Permitted Variances). All objections to this Interim Order to the extent not withdrawn, waived, settled or resolved, and all reservations of rights included therein, are hereby denied and overruled on the merits. This Interim Order shall become effective immediately upon its entry.

2. **Authorization of the DIP Facility**. The Debtor is expressly and immediately authorized and empowered to execute and deliver the DIP Loan Documents, and to incur and to perform the DIP Obligations in accordance with, and subject to, the terms of this Interim Order and the DIP Loan Documents, and to execute, deliver, and perform under all instruments, certificates, agreements, and documents which may be required or necessary for the performance by the Debtor under the DIP Loan Documents, and the creation and perfection of the DIP Liens described in and provided for by this Interim Order and the DIP Loan Documents. The Debtor is hereby authorized to pay, in accordance with this Interim Order, any principal, interest, fees, expenses, and other amounts described in the DIP Loan Documents and this Interim Order, as such amounts become due and owing, without need to obtain further Court approval (except as otherwise provided herein or in the DIP Loan Documents) subject to and in accordance with the terms hereof and thereof, including, without limitation, the Upfront Fee, the Exit Fee, as well as

-13-

any reasonable and documented fees and disbursements of counsel to the DIP Lender, as set forth herein and in the DIP Loan Documents, subject to Paragraph 26 of this Interim Order, whether or not such professional fees and disbursements arose before or after the Petition Date, and whether or not the transactions contemplated hereby are consummated, and to take any other actions that may be necessary or appropriate, all to the extent provided in this Interim Order and the DIP Loan Documents.  Upon execution and delivery, the DIP Loan Documents shall represent legal, valid, and binding obligations of the Debtor, enforceable against the Debtor and its estate in accordance with their terms.  Each officer of the Debtor acting individually is hereby authorized to execute and deliver each of the DIP Loan Documents.

3.    **DIP Obligations**.  The DIP Loan Documents and this Interim Order shall constitute and evidence the validity and binding effect of the Debtor's DIP Obligations.  All DIP Obligations shall be enforceable against the Debtor, its estate, and any successor thereto, including without limitation, any trustee appointed in the Chapter 11 Case, or in any case under chapter 7 of the Bankruptcy Code upon the conversion of the Chapter 11 Case, or in any other proceeding superseding or related to any of the foregoing (the "**Successor Case**").  Upon entry of this Interim Order, the DIP Obligations will include, but not be limited to, (a) the due and punctual payment by the Debtor of (i) the unpaid principal amount of and interest on (including interest accruing after the maturity of the DIP Loans and interest accruing after the Petition Date) the DIP Loans, as and when due, whether at maturity, by acceleration or otherwise, and (ii) all other monetary obligations, including advances, debts, liabilities, obligations, fees, including, but not limited to, the Upfront Fee, the Exit Fee, costs, expenses and indemnities, whether primary, secondary, direct, indirect, absolute or contingent, due or to become due, now existing or hereafter arising, fixed or otherwise, of the Debtor to the DIP Lender under the DIP Loan Documents and this Interim Order,

and (b) the due and punctual payment and performance of all covenants, duties, agreements, obligations and liabilities of the Debtor to the DIP Lender under or pursuant to the DIP Loan Documents and this Interim Order.  The Debtor shall be liable for the DIP Obligations.  Absent an Event of Default, the DIP Obligations shall become due and payable, without notice or demand, on the Maturity Date.  No obligation, payment, transfer, or grant of collateral as security hereunder or under the DIP Loan Documents (including any DIP Obligation or DIP Liens) to the DIP Lender shall be stayed, restrained, voidable, avoidable, or recoverable, under the Bankruptcy Code or under any applicable law (including, without limitation, under sections 502(d), 544, and 547–550 of the Bankruptcy Code or under any applicable state Uniform Voidable Transactions Act, Uniform Fraudulent Transfer Act, Uniform Fraudulent Conveyance Act, or similar statute or common law), or be subject to any disgorgement, avoidance, reduction, setoff, recoupment, offset, recharacterization, subordination (whether equitable, contractual, or otherwise), claim, counterclaim, charge, assessment, cross-claim, defense, or any other liability or challenge under the Bankruptcy Code or any applicable law or regulation by any person or entity for any reason.

4.     **Authorization to Borrow**.  To prevent immediate and irreparable harm to the Debtor's estate, and to enable the Debtor to continue to operate its business and preserve and maximize the value of its estate, subject to the terms and conditions set forth in the DIP Loan Documents and this Interim Order, the Debtor is hereby authorized to borrow under the DIP Facility, subject to any limitations on, or conditions to, borrowing under the DIP Loan Documents, which borrowings shall be used solely for purposes permitted under the DIP Loan Documents, including, without limitation, to provide for (i) working capital and general corporate purposes of the Debtor, (ii) for bankruptcy-related costs and expenses, and (iii) for costs and expenses related to the DIP Facility, in each case, in accordance with this Interim Order, the DIP Loan Documents,

-15-

and the Approved Budget (subject to Permitted Variances).  Under no circumstances shall the DIP

Lender have any obligation to lend any amounts above the DIP Commitment (as such term is

defined in the DIP Term Sheet and/or the DIP Loan Documents).

5.  **DIP Collateral**.  To secure the DIP Obligations, effective immediately upon entry

of this Interim Order, pursuant to sections 361, 362, 364(c)(2), 364(c)(3), and 364(d) of the

Bankruptcy Code, the DIP Lender is hereby granted, subject only to the Carve Out, continuing,

valid, binding, enforceable, nonavoidable, and automatically and properly perfected postpetition

security interests in and liens on (collectively, the "**DIP Liens**") the DIP Collateral.  The term

"**DIP Collateral**" means, collectively, the Debtor's right, title, and interest in, to and under all the

Debtor's assets, including, but not limited to the following, in each case, whether now owned or

existing or hereafter acquired, created or arising and wherever located: any and all cash, cash

equivalents, deposit accounts, securities accounts, accounts, other receivables, chattel paper,

contract rights, inventory (wherever located), instruments (including, without limitation,

promissory notes), documents, securities (whether or not marketable) and investment property

(including, without limitation, all of the issued and outstanding capital stock of the Debtor, all

securities accounts and security entitlements related thereto, and financial assets carried therein,

and all commodity accounts and commodity contracts), hedge agreements, ships and vessels,

furniture, fixtures, equipment (including documents of title), goods, vehicles, franchise rights,

trade names, trademarks, service marks, copyrights, patents, license rights, intellectual property,

general intangibles (including, for the avoidance of doubt, payment intangibles and hedging

arrangements), rights to the payment of money (including, without limitation, tax refunds and any

other extraordinary payments), supporting obligations, guarantees, letter of credit rights,

commercial tort claims, causes of action, and all substitutions, indemnification rights, all present

ACTIVE/201263025.8

and future intercompany debt, fee interests in real property owned by the Debtor, books, records, ledger cards, files, correspondence, customer lists, blueprints, technical specifications, manuals, computer software, computer printouts, tapes, disks, and other electronic storage media and related data processing software related to the foregoing, and accessions, products, rents, profits, and proceeds of the foregoing, wherever located, including insurance proceeds or other proceeds; (b) all owned real property interests and all proceeds of leased real property; (c) actions brought under section 549 of the Bankruptcy Code to recover any postpetition transfer of DIP Collateral; (d) subject to and upon entry of the Final Order, the proceeds of any avoidance actions (such actions, "**Avoidance Actions**") brought pursuant to chapter 5 of the Bankruptcy Code or section 724(a) of the Bankruptcy Code or any other avoidance actions under the Bankruptcy Code or applicable state law or foreign law equivalents; provided, however, DIP Collateral shall not include (i) assets, contracts, leases, and other licenses solely to the extent a DIP Lien is not permitted by law to attach to such property, in which case the proceeds of such assets, contracts, leases, and other licenses shall be DIP Collateral and (ii) Avoidance Actions.

6.    **Disposition of Collateral**.  Except as contemplated by the 363 Sale Process, the Debtor shall not sell, transfer, lease, encumber or otherwise dispose of any portion of the DIP Collateral, other than in the ordinary course of business or in connection with the payments contemplated under this Interim Order, the DIP Loan Documents, or the Approved Budget (subject to the Permitted Variances), without the prior written consent of the DIP Lender (and no such consent shall be implied from any other action, inaction or acquiescence by the DIP Lender or from any order of this Court), which consent shall not unreasonably be withheld or delayed. Notwithstanding anything otherwise provided herein, 100% of any net cash proceeds of any sale

ACTIVE/201263025.8

of DIP Collateral outside of the ordinary course of business shall be used to immediately satisfy the DIP Obligations, subject only to the satisfaction of the Carve Out.

7.      **DIP Liens**.  To secure the DIP Obligations, immediately upon and effective as of entry of this Interim Order, the DIP Lender is hereby granted on a final basis, continuing, valid, binding, enforceable, non-avoidable, and automatically and properly perfected first priority DIP Liens in the DIP Collateral under section 364(c)(2) of the Bankruptcy Code, subject to the Carve Out.  Other than as set forth herein or in the DIP Loan Documents, the DIP Liens shall not be made subject to or *pari passu* with any lien or security interest heretofore or hereinafter granted in the Chapter 11 Case or any Successor Case, and shall be valid and enforceable against any trustee appointed in the Chapter 11 Case or any Successor Case, upon the conversion of any of the Chapter 11 Case to a case under chapter 7 of the Bankruptcy Code (or in any other Successor Case), and/or upon the dismissal of the Chapter 11 Case or Successor Case.  The DIP Liens shall not be subject to section 510, 549, or 550 of the Bankruptcy Code.  No lien or interest avoided and preserved for the benefit of the Debtor's estate pursuant to section 551 of the Bankruptcy Code shall be *pari passu* with or senior to the DIP Liens.

8.      **DIP Superpriority Claims**.  Subject to the Carve Out, upon entry of this Interim Order, the DIP Lender is hereby granted, pursuant to section 364(c)(1) of the Bankruptcy Code, allowed superpriority administrative expense claims in the Chapter 11 Case and any Successor Case (collectively, the "**DIP Superpriority Claims**") for all DIP Obligations (a) with priority over any and all administrative expense claims and unsecured claims against the Debtor or its estate in the Chapter 11 Case and any Successor Case, at any time existing or arising, of any kind or nature whatsoever, including, without limitation, administrative expenses of the kinds specified in or ordered pursuant to sections 105, 326, 328, 330, 331, 364, 503(a), 503(b), 507(a), 507(b), 546(c),

ACTIVE/201263025.8

546(d), 726, 1113, and 1114 of the Bankruptcy Code, and any other provision of the Bankruptcy Code, as provided under section 364(c)(1) of the Bankruptcy Code, and (b) which shall at all times be senior to the rights of the Debtor and its estate, and any successor trustee or other estate representative to the extent permitted by law.

9.      **No Obligation to Extend Credit**.  The DIP Lender shall have no obligation to make any loan or advance under the DIP Term Sheet or any of the DIP Loan Documents unless all of the conditions precedent under the DIP Loan Documents and this Interim Order have been satisfied in full or waived by the DIP Lender (in its sole discretion) in accordance with the terms of the DIP Loan Documents.

10.      **Use of DIP Facility Proceeds**.  From and after the Petition Date, the Debtor shall be permitted to use advances of credit under the DIP Facility only for the purposes specifically set forth in this Interim Order and the DIP Loan Documents, and only in compliance with the Approved Budget (subject to the Permitted Variances) and the terms and conditions in this Interim Order and the DIP Loan Documents.

11.      **No Monitoring Obligation**. The DIP Lender shall not have any obligation or responsibility to monitor any Debtor's use of the DIP Facility, and the DIP Lender may rely upon each Debtor's representation that the use of the DIP Facility at any time is in accordance with the requirements of this Interim Order and the DIP Loan Documents, including but not limited to the Approved Budget.

12.      **Authorization to Use Cash Collateral.**  Subject to the terms and conditions of this Interim Order and the DIP Loan Documents, and in accordance with the Approved Budget (subject to the Permitted Variances), the Debtor is authorized to use the DIP Collateral (including Cash Collateral) until the Termination Date.   Nothing in this Interim Order shall authorize the

-19-

disposition of any assets of the Debtor outside the ordinary course of business, or the use of any Cash Collateral or other proceeds resulting therefrom, except as permitted by this Interim Order, the DIP Loan Documents, and in accordance with the Approved Budget (subject to the Permitted Variances), as applicable.

13.      **Amendments of the DIP Loan Documents**. The Debtor and the DIP Lender may enter into one or more amendments, waivers, consents, or other modifications to and under the DIP Loan Documents, in each case in accordance with the terms of the applicable DIP Loan Documents and in such form as the Debtor and the DIP Lender agree and no further approval of this Court shall be required for any amendment, waiver, consent, or other modification to and under the DIP Loan Documents (and any fees paid in connection therewith) that does not materially and adversely affect the Debtor or which does not (i) shorten the maturity of the DIP Facility, (ii) increase the principal amount of, the rate of interest on, or the fees payable in connection with the DIP Facility, or (iii) change any Maturity Date in a manner inconsistent with the DIP Term Sheet or Event of Default , add any covenants, or amend the covenants in each case to be materially more restrictive (any such amendment, a "**Non-Material Amendment**"); *provided, however*, notice of any such Non-Material Amendment shall be provided by the Debtor to the U.S. Trustee two days in advance of its effectiveness, to the extent reasonably practicable. No consent to any such amendment, waiver, consent, or modification set forth in this paragraph shall be implied by any action, inaction, or acquiescence of the DIP Lender.  After obtaining the DIP Lender's prior written consent, the Debtor is authorized and empowered, without further notice and hearing or approval of this Court, to amend, modify, supplement, or waive any provision of the DIP Loan Documents to reflect a Non-Material Amendment in accordance with the

ACTIVE/201263025.8

provisions thereof.  Any material amendment of the DIP Loan Documents shall be subject to approval by the DIP Lender and this Court.

14.     **DIP Budget and DIP Facility Reporting.**  Except as otherwise provided herein or approved by the DIP Lender, the proceeds from the DIP Facility shall be used only in compliance with the terms of the DIP Term Sheet (and/or the DIP Loan Documents).  The Debtor shall comply with the reporting requirements and obligations set forth in the DIP Term Sheet (and/or the DIP Loan Documents).

15.     **Perfection of DIP Liens**. This Interim Order shall be sufficient and conclusive evidence of the creation, validity, perfection, and priority of the DIP Liens without the necessity of filing or recording any financing statement, mortgage, deed of trust, notice, or other instrument or document which may otherwise be required under the law or regulation of any jurisdiction or the taking of any other action (including, for the avoidance of doubt, entering into any deposit account control agreement) to validate or perfect (in accordance with applicable non-bankruptcy law) the DIP Liens or to entitle the DIP Lender to the priorities granted herein.  Notwithstanding the foregoing, the DIP Lender is authorized, but not required, to file, as each deems necessary or advisable, such financing statements, security agreements, mortgages, notices of liens and other similar documents to perfect in accordance with applicable non-bankruptcy law or to otherwise evidence the DIP Liens, and all such financing statements, mortgages, notices and other documents shall be deemed to have been filed or recorded as of the date of the Motion; provided, however, that no such filing or recordation shall be necessary or required in order to create or perfect the DIP Liens.  The DIP Lender may, in its discretion, file an electronic copy or photocopy of this Interim Order as a financing statement with any filing or recording office or with any registry of

deeds or similar office in addition to or in lieu of such financing statements, notices of lien or similar instruments.

16.     **Modification of Automatic Stay**.   The automatic stay of section 362 of the Bankruptcy Code is hereby modified and vacated to the extent necessary to permit the Debtor and the DIP Lender to accomplish the transactions contemplated by this Interim Order.

17.     **Proceeds of Subsequent Financing**.   If the Debtor, any trustee, any examiner, or any responsible officer subsequently appointed in any of the Chapter 11 Case or any Successor Case, shall obtain credit or incur debt pursuant to sections 364(b), 364(c), or 364(d) of the Bankruptcy Code in violation of the DIP Loan Documents at any time prior to the indefeasible repayment in full in cash of all DIP Obligations (other than unasserted contingent obligations that expressly survive termination of the DIP Loan Documents) and the termination of the DIP Lender's obligation to extend credit under the DIP Facility, then, after satisfaction of the Carve Out, and unless otherwise agreed by the DIP Lender, all cash proceeds derived from such credit or debt shall immediately be turned over to the DIP Lender to be distributed in accordance with this Interim Order and the DIP Loan Documents, provided that nothing contained in this Interim Order or the DIP Loan Documents shall be deemed to restrict the Debtor from continuing to operate its business in the ordinary course, including its receivables financing business.

18.     **Payments Held in Trust**.   Except as expressly permitted in this Interim Order or the DIP Loan Documents or otherwise ordered by this Court, including in respect of the Carve Out, in the event that any person or entity receives any payment on account of a security interest in the DIP Collateral or receives any DIP Collateral or any proceeds of DIP Collateral prior to indefeasible payment in full in cash of all DIP Obligations under the DIP Loan Documents, and termination of the DIP Facility in accordance with the DIP Term Sheet, such person or entity shall

ACTIVE/201263025.8

be deemed to have received, and shall hold, any such payment or proceeds of DIP Collateral and shall subject to the Carve Out immediately turn over such proceeds to the DIP Lender, for application in accordance with the DIP Term Sheet and this Interim Order.

19.     **Maintenance of DIP Collateral**.  Until the payment in full of the DIP Obligations, the Debtor shall: (a) insure the DIP Collateral to the extent required under the DIP Loan Documents, and (b) maintain the cash management system consistent with the terms and conditions of any order(s) governing the Debtor's cash management systems and the DIP Loan Documents.

20.     **Right to Credit Bid**.  Pursuant to section 363(k) of the Bankruptcy Code and the DIP Loan Documents, and subject to Paragraph 29 of this Interim Order, the DIP Lender may credit bid all or any portion of its claims, including, without limitation, the DIP Obligations and the DIP Superpriority Claim, in connection with any proposed sale of any, all, or substantially all of the Debtor's assets, whether occurring pursuant to section 363 of the Bankruptcy Code or included as part of a reorganization plan under section 1123 of the Bankruptcy Code, including a plan subject to confirmation under section 1129(b)(2)(A)(ii) of the Bankruptcy Code, or a sale or disposition by a chapter 7 trustee for the Debtor under section 725 of the Bankruptcy Code.

21.     **DIP Termination Event; Exercise of Remedies.**

(a)     **DIP Termination Events**.  A "DIP Termination Event" shall exist or occur upon the occurrence of any of the "Events of Default" listed or identified in the DIP Term Sheet.

(b)     **Exercise of Remedies**.  Upon the occurrence of a DIP Termination Event, without further notice to, hearing of, application to, or order from this Court, the automatic stay provisions of section 362 of the Bankruptcy Code shall be vacated and modified to the extent necessary to permit the DIP Lender to take any of the following actions, at the same or different time: (i) deliver a written notice (which may be via electronic mail) to counsel for the Debtor and the U.S. Trustee, (the "**Remedies Notice**") declaring the occurrence of a DIP Termination Event

-23-

(such date, the "**DIP Termination Declaration Date**") and/or deliver a Carve Out Trigger Notice (as defined and in the manner described below), (ii) declare the termination, reduction or restriction of the commitments under the DIP Facility (to the extent any such commitment remains), (iii) declare all DIP Obligations to be immediately due and payable, without presentment, demand or protest or other notice of any kind, all of which are expressly waived by the Debtor, (iv) declare the termination, restriction or reduction of the DIP Facility and the Term Sheet (and/or the DIP Loan Documents) as to any further liability or obligation thereunder, but without affecting the DIP Liens, the DIP Superpriority Claims, or the DIP Obligations, (v) charge default interest at the default rate set forth in the DIP Term Sheet, and (vi) declare the termination, restriction, or revocation of the ability of the Debtor to use Cash Collateral.

(c)     **Waiting Period Procedures**.  The Debtor may seek an emergency hearing during the period beginning on the DIP Termination Date and prior to the expiration of the seven (7) days following the DIP Termination Date (such period, the "**Waiting Period**").  During the Waiting Period, the Debtor shall continue to have the right to use DIP Collateral (including Cash Collateral) in accordance with the terms of this Interim Order and the DIP Loan Documents, solely to pay any expenses which are necessary to (a) preserve the Debtor's going-concern value or (b) contest in good faith the occurrence of the Maturity Date or Event of Default; provided, however, that the professional fees and expenses of the Debtor Professionals (as defined below) shall be governed by Paragraph 23 and subject to the Approved Budget  The DIP Lender shall not (x) object to any motion filed by the Debtor during the Waiting Period seeking an expedited hearing with respect to the Remedies Notice or (y) seek to reduce such Waiting Period.

(d)     **Rights and Remedies Following Termination Date**.  Subject to the Carve Out, following a DIP Termination Date and unless this Court has entered an order prior to the expiration of the Waiting Period finding that a Maturity Date or an Event of Default has not occurred, or otherwise the Court finding cause to enjoin the DIP Lender from exercising its rights and remedies, the DIP Lender shall be entitled to exercise all rights and remedies in accordance with the DIP Term Sheet (and/or the DIP Loan Documents), this Interim Order, and applicable

-24-

law and the automatic stay of section 362 of the Bankruptcy Code shall automatically, without further order, be lifted, to allow the DIP Lender to pursue all rights and remedies in accordance with the Term Sheet (and/or the DIP Loan Documents), this Interim Order, and applicable law.

22.    **No Waiver by Failure to Seek Relief.**  The rights and remedies of the DIP Lender specified herein are cumulative and not exclusive of any rights or remedies that the DIP Lender may have under this Interim Order, the DIP Term Sheet (and/or the DIP Loan Documents), applicable law, or otherwise.  The failure or delay on the part of the DIP Lender to seek relief or otherwise exercise its rights and remedies under this Interim Order, the DIP Term Sheet (and/or the DIP Loan Documents), or applicable law, as the case may be, shall not constitute a waiver of any of its respective rights hereunder, thereunder, or otherwise.  Except as expressly set forth herein, none of the rights or remedies of the DIP Lender under this Interim Order or the DIP Term Sheet (and/or the DIP Loan Documents) shall be deemed to have been amended, modified, suspended, or waived unless such amendment, modification, suspension, or waiver is express, in writing and signed by the DIP Lender.  No consents required hereunder by the DIP Lender shall be implied by any inaction or acquiescence by the DIP Lender.

23.    **Carve Out**.

(a)    **Priority of Carve Out**.  Notwithstanding anything to the contrary in this Interim Order, the DIP Liens and the DIP Superpriority Claims shall be subject and subordinate to payment of the Carve Out.  The Carve Out shall be senior to all claims and liens over all assets of the Debtor, including any DIP Collateral, as set forth in this Interim Order.

(b)    **Carve Out.**  The term "Carve Out" shall mean the sum of (i) unpaid fees and expenses required to be paid by the Debtor to the Clerk of this Court or to the U.S. Trustee under 28 U.S.C. § 1930(a), together with any interest thereon pursuant to 31 U.S.C. § 3717, which shall not be subject to the Approved Budget; (ii) Court-allowed fees and expenses of a trustee in any Successor Case appointed under section 726(b) of the Bankruptcy Code in an amount not to

-25-

exceed $25,000, (iii) to the extent allowed at any time, whether by interim order, procedural order, or otherwise, all unpaid fees and expenses (the "**Allowed Professional Fees**") incurred by persons or firms retained by the Debtor pursuant to sections 327, 328, or 363 of the Bankruptcy Code (the "**Debtor Professionals**") at any time before or on the first business day following delivery by the DIP Lender of a Carve Out Trigger Notice, whether allowed by this Court prior to or after delivery of a Carve Out Trigger Notice (the "Pre-Trigger Date Fees"); subject to and not to exceed the Approved Budget and any limits by this Interim Order, provided that Debtor Professional may carry forward budgeted but unused disbursements set forth in the Approved Budge for any week for use in any subsequent week, and (iv) Allowed Professional Fees of the Debtor Professionals in an aggregate amount not to exceed $300,000, incurred after the first calendar day following delivery by the DIP Lender of the Carve Out Trigger Notice (the "**Carve Out Trigger Date**"), to the extent allowed at any time, whether by interim order, procedural order, or otherwise (the amounts set forth in this clause (iv) being the ("**Post-Carve Out Trigger Notice Cap**" and together with the Pre-Trigger Date Fees, the "**Carve Out Amount**")).

(c)     For purposes of the foregoing, "**Carve Out Trigger Notice**" shall mean a written notice delivered by email (or other electronic means) by the DIP Lender or its counsel to the Debtor, its lead restructuring counsel, and the U.S. Trustee, which notice may be delivered following the occurrence and during the continuation of an Event of Default and acceleration of the DIP Obligations under the DIP Facility stating that the Post-Carve Out Trigger Notice Cap has been invoked.  On the day on which a Carve Out Trigger Notice is received by the Debtor, the Carve Out Trigger Notice shall constitute a demand to the Debtor to transfer cash to the Carve Out Account in an amount equal to the Carve Out Amount (which shall include:  (i) an amount equal to the Debtor's professional good faith estimate of the Pre-Trigger Date Fees unpaid as of the Carve Out Trigger Date; and (ii) an amount equal to the Post-Carve Out Trigger Notice Cap).

(d)     On a weekly basis, the fees of the Debtor Professionals provided in the Approved Budget shall be funded into an escrow account with Potter Anderson & Corroon LLP to satisfy the professional fees included within the Carve Out (the "**Professional Fee Reserve**").

-26-

The funds on deposit in the Professional Fee Reserve shall be available to satisfy the obligations owed to the Debtor Professionals benefiting from the Carve Out, including all Allowed Professional Fees.  Any excess amounts (if any) in the Professional Fee Reserve after payment of all Allowed Professional Fees shall be subject in all respects to the DIP Liens.

(e)    **Carve Out Account**.  Immediately upon the delivery of a Carve Out Trigger Notice, and prior to the payment of any DIP Obligations, the Debtor shall be required to deposit cash in an amount up to the Carve Out Amount into the Professional Fee Reserve.  The Professional Fee Reserve shall be available only to satisfy amounts included in the Carve Out until such amounts are paid in full, and thereafter available to the DIP Lender.  The amount in the Professional Fee Reserve shall be reduced on a dollar-for-dollar basis for amounts included in the Carve Out that are paid after the delivery of the Carve Out Trigger Notice, and the Professional Fee Reserve shall not be replenished for such amounts so paid.  The failure of the Professional Fee Reserve to satisfy in full the amount set forth in the Carve Out shall not affect the priority of the Carve Out.

(f)    **Carve Out Draw**.  Subject to exhaustion of the DIP Commitment, the Debtor shall be permitted to draw on the DIP Facility in the Carve Out Amount less the amounts contained in the Professional Fee Reserve, notwithstanding any default, Event of Default, or the occurrence of a Carve Out Trigger Date; provided, however, the DIP Lender shall not have any obligation to fund any Carve Out shortfall beyond what it is obligated to fund under the DIP Commitment.  Any Carve Out Trigger Notice shall be deemed a consent by the DIP Lender to the Debtor depositing Cash Collateral or proceeds of the DIP Facility into the Professional Fee Reserve up to an amount necessary to ensure that the amount in the Professional Fee Reserve equals the sum of the Carve Out Amount.

(g)    **Payment of Allowed Professional Fees Prior to the Carve Out Trigger Date**.  Any payment or reimbursement made prior to the occurrence of the Carve Out Trigger Date in respect of any Allowed Professional Fees shall not reduce the Carve Out.

-27-

(h)     **No Direct Obligation to Pay Professional Fees**.  The DIP Lender shall not be responsible for the direct payment or reimbursement of any fees or disbursements of any of the Professional Persons incurred in connection with the Chapter 11 Case or any Successor Cases under any chapter of the Bankruptcy Code.  Nothing in this Interim Order or otherwise shall be construed to obligate the DIP Lender in any way to pay compensation to, or to reimburse expenses of, any of the Professional Persons, or to guarantee that the Debtor or its estate has sufficient funds to pay such compensation or reimbursement. Notwithstanding any provision in this paragraph to the contrary, no portion of the Carve Out, any Cash Collateral, any DIP Collateral or any proceeds of the DIP Facility (including any disbursements set forth in the Approved Budget or obligations benefitting from the Carve Out) shall be utilized for the payment of professional fees and disbursements to the extent restricted under Paragraph 23 herein.

(i)     **No Waiver of Right to Object to Fees**.  Nothing contained in this Interim Order shall be construed: (i) to exempt Debtor Professionals who may receive interim compensation payments or reimbursement of expenses pursuant to any Court-approved procedure, from any provisions of bankruptcy law otherwise applicable, including, without limitation, any requirements that such compensation or reimbursement be allowed on a final basis after the filing of appropriate final fee applications, or (ii) as consent to the allowance of any fees and expenses referred to above; and shall not affect any right of the DIP Lender to object to the allowance, reasonableness, and/or payment of any such  fees and expenses or amounts incurred or requested.

24.     **Good Faith Under Section 364(e) of the Bankruptcy Code; No Modification or Stay of this Interim Order**.  The DIP Lender has acted in good faith in connection with the DIP Facility, the DIP Loan Documents, and this Interim Order, and is entitled to rely upon the protections granted herein and by section 364(e) of the Bankruptcy Code. Based on the findings set forth in this Interim Order and the record made during the Interim Hearing, and in accordance

with section 364(e) of the Bankruptcy Code, and notwithstanding any modification or vacatur of any or all of the provisions of this Interim Order by a subsequent order of this Court or any other court, the DIP Lender is entitled to the protections provided in section 364(e) of the Bankruptcy Code.

25.    **Approval of DIP Fees**.  In consideration for the DIP Facility, the DIP Lender shall be paid all fees, expenses and other amounts payable under the DIP Loan Documents as such become due, including, without limitation, the Upfront Fee, Exit Fee, Extension Fee (if earned), and the reasonable and documented fees and expenses of the DIP Lender in connection with the DIP Facility (all such fees, together, the "**DIP Fees**").  The DIP Fees are deemed to be fully earned and payable in accordance with the terms of the DIP Loan Documents without the need for any further order of this Court.  The DIP Fees shall be part of the DIP Obligations.  The Upfront Fee and the Exit Fee are approved on a final basis and the Upfron Fee shall be paid from the Interim Advance.

26.    **DIP Lender's Professionals' Fees**.  Professionals for the DIP Lender (Norton Rose Fulbright US LLP and Morris James LLP) (the "**DIP Lender's Professionals**," and each a "**DIP Lender's Professional**") shall provide summary copies of its invoices (which shall not be required to contain time entries and which may be redacted or modified to the extent necessary to delete any information subject to the attorney-client privilege, any information constituting attorney work product or any other confidential information, and the provision of such invoices shall not constitute any waiver of the attorney-client privilege or of any benefits of the attorney work product doctrine) by electronic mail to counsel to the Debtor and the U.S. Trustee.  The Debtor shall promptly pay in full all such undisputed invoiced fees and expenses at the conclusion of the Review Period (as defined below) other than the Disputed Invoiced Fees (as defined below).

-29-

Any objections raised by the Debtor or the U.S. Trustee with respect to such invoices (the "**Disputed Invoiced Fees**") must be in writing (which may be by e-mail) and state with particularity the grounds therefor (which may include a request for backup showing time detail entries) and must be submitted to the applicable professional within seven (7) days of the receipt of such invoice (the "**Review Period**") (to be followed by the filing with this Court, if necessary, of a motion or other pleading, with at least ten (10) days prior written notice by the submitting party of any hearing on such motion or other pleading).  Notwithstanding the foregoing, the Debtor shall pay on or about the Closing Date, all undisputed reasonable and documented fees, costs and out-of-pocket expenses of the DIP Lender incurred on or prior to such date without the need for any DIP Lender's Professional to first deliver a copy of its invoice as provided for herein (other than to the Debtor).  No DIP Lender's Professionals shall be required to file an application seeking compensation for services or reimbursement of expenses with this Court.

27.    **Indemnification**. The DIP Lender (and its affiliates and respective officers, directors, employees, advisors, and agents, solely in such capacity) (each such person, an "Indemnitee") will have no liability for, and will be indemnified and held harmless against, any losses, claims, damages, liabilities or expenses incurred in respect of the financing contemplated hereby or the use or the proposed use of proceeds thereof, except to the extent they are found by a final, non-appealable judgment of a court of competent jurisdiction to arise from the gross negligence, bad faith or willful misconduct of the relevant indemnified person (or any of its affiliates or any of its or its respective officers, directors, employees, advisors or agents).  Such indemnity shall not be available (a) to the extent arising from a material breach of any obligation of such Indemnitee under the DIP Loan Documents or (b) to the extent arising out of any loss, claim, damage, liability or expense that does not involve an act or omission of the Debtor and that

-30-

is brought by an Indemnitee against another Indemnitee (other than claims against an Indemnitee in its capacity or in fulfilling its role as DIP Lender or any similar role under the DIP Loan Documents).

28.     **Proofs of Claim**.  The DIP Lender shall not be required to file a proof of claim in the Chapter 11 Case or Successor Case, and the entry of this Interim Order shall be deemed to constitute a timely filed proof of claim.  Any order entered by this Court in relation to the establishment of a bar date for any claim (including without limitation, administrative claims) in this Chapter 11 Case or Successor Case shall not apply to the DIP Lender.  Notwithstanding the foregoing, the DIP Lender may, in its sole discretion, but is not required to, file (and amend and/or supplement, as it sees fit) a proof of claim and/or aggregate proofs of claim in the Chapter 11 Case for any claim allowed herein.

29.     **Limitations on Use of DIP Proceeds, Cash Collateral, the Carve Out and Other Funds**.  Except as otherwise permitted in this Interim Order (including, without limitation, by the Waiting Period Procedures) and the DIP Loan Documents, the Approved Budget, the DIP Facility, the DIP Collateral, the Cash Collateral, and the Carve Out may not be used, directly or indirectly, by the Debtor or any trustee or other estate representative appointed in the Chapter 11 Case (or any Successor Case) or any other person or entity (or to pay any professional fees, disbursements, costs or expenses incurred in connection therewith) in connection with (a) preventing, hindering, or delaying any of the DIP Lender's enforcement or realization upon any of the DIP Collateral; (b) using or seeking to use Cash Collateral without the permission of the DIP Lender, or selling or otherwise disposing of DIP Collateral outside of the ordinary course without the consent of the DIP Lender or as permitted by the DIP Loan Documents; (c) using or seeking to use any insurance proceeds constituting DIP Collateral without the consent of the DIP Lender; (d) seeking to amend

or modify any of the rights granted to the DIP Lender under this Interim Order or the DIP Loan Documents, including seeking to use Cash Collateral and/or DIP Collateral on a contested basis; (e) litigating, objecting to, challenging or contesting in any manner the DIP Liens, DIP Obligations, DIP Superpriority Claims, the DIP Collateral (including Cash Collateral), or any other claims held by or on behalf of the DIP Lender; (f) asserting, commencing or prosecuting any claims or causes of action whatsoever, including, without limitation, Avoidance Actions or applicable state law equivalents or actions to recover or disgorge payments, against the DIP Lender or any of its affiliates, agents, attorneys, advisors, professionals, officers, directors, or employees; (g) litigating, objecting to, challenging, or contesting in any manner, or raising any defenses to, the validity, extent, amount, perfection, priority, or enforceability of any of the DIP Obligations, the DIP Liens, or any other liens or interests of the DIP Lender; or (h) seeking to subordinate, recharacterize, disallow or avoid the DIP Obligations.

30.      **Releases**.  Upon entry of this Interim Order, the Debtor, on its own behalf and its estate, forever and irrevocably: (a) releases, discharges, and acquits the DIP Lender and its respective former or current officers, employees, directors, agents, representatives, owners, members, partners, financial advisors, legal advisors, shareholders, managers, consultants, accountants, attorneys, affiliates, and predecessors-in-interest, in each case solely in their capacity as such, of and from any and all claims, demands, liabilities, responsibilities, disputes, remedies, causes of action, indebtedness and obligations, of every type, including, without limitation, any so-called "lender liability" or equitable subordination claims or defenses, solely with respect to or relating to the negotiation of and entry into the DIP Loan Documents arising prior to the date of the entry of this Interim Order; and (b) waives, discharges and releases any and all defenses

(including, without limitation, offsets and counterclaims of any nature or kind) as to the validity, perfection, priority, enforceability, and avoidability of the DIP Liens and the DIP Obligations.

31.     **Waivers**.  Subject to entry of a Final Order (with the exception of the Interim Advance) and as a further condition of the DIP Loan Documents and any obligation of the DIP Lender to make credit extensions pursuant to the DIP Loan Documents (and the consent of the DIP Lender, to the payment of the Carve Out to the extent provided herein):

(a)     **Limitation on Charging Expenses**.    No costs or expenses of administration of the Chapter 11 Case or any Successor Case shall be charged against or recovered from or against the DIP Lender with respect to the DIP Collateral, pursuant to section 105 or section 506(c) of the Bankruptcy Code or otherwise, without the prior written consent of the DIP Lender, and no such consent shall be implied from any other action, inaction, or acquiescence of the DIP Lender.

(b)     **No Marshalling**.  In no event shall the DIP Lender be subject to the equitable doctrine of "marshaling" or any similar doctrine with respect to the DIP Collateral or DIP Obligations, and all proceeds shall be received and applied in accordance with this Interim Order and the DIP Term Sheet.

32.     **No Lender Liability**.  In determining to make any loan (whether under the DIP Loan Documents or otherwise) or to permit the use of Cash Collateral, the DIP Lender shall not owe any fiduciary duty to the Debtor, its creditors, shareholders, or estate, or be deemed to be in control of the operations of the Debtor or to be acting as a "responsible person" or "owner or operator" with respect to the operation or management of the Debtor.  Furthermore, nothing in this Interim Order shall in any way be construed or interpreted to impose or allow the imposition upon

ACTIVE/201263025.8

the DIP Lender of any liability for any claims arising from the prepetition or postpetition activities of any of the Debtor and its affiliates, if any (as defined in section 101(2) of the Bankruptcy Code).

33.   **Limitation of Liability**. Nothing in this Interim Order, the DIP Loan Documents, or any other documents related to these transactions shall in any way be construed or interpreted to impose or allow the imposition upon the DIP Lender of (a) any liability for any claims arising from the prepetition or postpetition activities of the Debtor in the operation of its business, or in connection with their restructuring efforts or (b) any fiduciary duties to the Debtor, its respective creditors, shareholders, or estate.   The DIP Lender shall not, in any way or manner, be liable or responsible for (i) the safekeeping of the DIP Collateral, (ii) any loss or damage thereto occurring or arising in any manner or fashion from any cause, (iii) any diminution in value thereof, or (iv) any act or default of any carrier, servicer, bailee, custodian, forwarding agency, or other person and all risk of loss, damage, or destruction of the DIP Collateral shall be borne by the Debtor.

34.   **No Third-Party Beneficiaries**.   Except as explicitly provided for herein, this Interim Order does not create any rights for the benefit of any Debtor Professionals, third-party, creditor, landlord, lessor, equity holder, or any direct, indirect, or incidental beneficiary.

35.   **Insurance Proceeds and Policies**.   Upon entry of this Interim Order and to the fullest extent provided by applicable law, the DIP Lender shall be, and shall be deemed to be, without any further action or notice, named as additional insured and loss payee on each insurance policy maintained by the Debtor that in any way relates to the DIP Collateral.

36.   **No Waivers or Modifications of Interim Order**.   The Debtor irrevocably waives any right to seek any modification or extension of this Interim Order without the prior written consent of the DIP Lender and no such consent shall be implied by any other action, inaction or acquiescence of the DIP Lender.

ACTIVE/201263025.8

37.     **Binding Effect of this Interim Order**.  Immediately upon entry of this Interim Order by this Court, the terms and provisions of this Interim Order shall become valid and binding upon and inure to the benefit of the Debtor, the DIP Lender, all other creditors of the Debtor and all other parties-in-interest and their respective successors and assigns, including any trustee or other fiduciary hereafter appointed in the Chapter 11 Case, any Successor Case, or upon dismissal of the Chapter 11 Case or any Successor Case; provided, that the DIP Lender shall not have an obligation to permit the use of DIP Collateral (including Cash Collateral) or to extend any financing to any chapter 7 trustee, chapter 11 trustee or similar responsible person appointed for the Debtor's estate.

38.     **Discharge**.  Except as otherwise agreed in writing by the DIP Lender, the DIP Obligations shall not be discharged by the entry of an order confirming any plan of reorganization in any of the Chapter 11 Case, notwithstanding the provisions of section 1141(d) of the Bankruptcy Code, unless such obligations have been indefeasibly paid in full in cash, on or before the effective date of such confirmed plan of reorganization.

39.     **Survival**.  The provisions of this Interim Order and any actions taken pursuant hereto shall survive entry of any order which may be entered: (a) confirming any chapter 11 plan in any of the Chapter 11 Case; (b) converting the Chapter 11 Case to a case under Chapter 7 of the Bankruptcy Code; (c) dismissing the Chapter 11 Case or any Successor Case; or (d) pursuant to which this Court abstains from hearing the Chapter 11 Case or Successor Case.  The terms and provisions of this Interim Order, including the claims, liens, security interests and other protections granted to the DIP Lender pursuant to this Interim Order and the DIP Loan Documents, shall continue in the Chapter 11 Case, in any Successor Case, or following dismissal of any of the Chapter 11 Case or any Successor Case, and shall maintain their priority as provided by this

ACTIVE/201263025.8

Interim Order until, in respect of the DIP Facility, all the DIP Obligations, pursuant to the DIP Loan Documents and this Interim Order, have been paid in full (such payment being without prejudice to any terms or provisions contained in the DIP Facility which survive such discharge by their terms).  The terms and provisions concerning the indemnification of the DIP Lender shall continue in the Chapter 11 Case, in any Successor Case, following dismissal of the Chapter 11 Case or any Successor Case, following termination of the DIP Facility and/or the indefeasible repayment of the DIP Obligations.

40.      **Necessary Actions**. The Debtor is authorized and directed to take any and all such necessary actions as are reasonable and appropriate to implement the terms of this Interim Order.

41.      **Enforceability**.   This Interim Order shall constitute findings of fact and conclusions of law pursuant to Bankruptcy Rule 7052 and shall take effect and be enforceable immediately upon entry thereof.  Notwithstanding Bankruptcy Rules 4001(a)(3), 6004(h), 6006(d), 7062 or 9014 of the Bankruptcy Rules, any applicable Local Rules, or Rule 62(a) of the Federal Rules of Civil Procedure, this Interim Order shall be immediately effective and enforceable upon its entry and there shall be no stay of execution or effectiveness of this Interim Order.

42.      **Rights Reserved**.  Notwithstanding anything herein to the contrary, the entry of this Interim Order is without prejudice to, and does not constitute a waiver of, expressly or implicitly: (a) the rights of the DIP Lender to seek any other or supplemental relief in respect of the Debtor; (b) the rights of the DIP Lender under the DIP Loan Documents, or the Bankruptcy Code or applicable non-bankruptcy law, including, without limitation, the right to (i) request modification of the automatic stay of section 362 of the Bankruptcy Code, (ii) request dismissal of the Chapter 11 Case, conversion of the Chapter 11 Case to a case under chapter 7, or appointment of a chapter 11 trustee or examiner with expanded powers, or (iii) propose, subject to

ACTIVE/201263025.8

the provisions of section 1121 of the Bankruptcy Code, a chapter 11 plan; or (c) any other rights, claims, or privileges (whether legal, equitable or otherwise) of the DIP Lender.

43.    **Interim Order Controls**.  In the event of any conflict or inconsistency between or among the terms or provisions of this Interim Order, any of the DIP Loan Documents, unless such term or provision in this Interim Order is phrased in terms of "defined in" or "as set forth in" the DIP Loan Documents, the terms and provisions of this Interim Order shall govern and control.

44.    **Headings**. All paragraph headings used in this Interim Order are for ease of reference only and are not to affect the construction hereof or to be taken into consideration in the interpretation hereof.

45.    **Final Hearing**. The Final Hearing is scheduled for **July__, 2025, at __:_0 _.m. (prevailing Eastern Time)**, at which time any party in interest may present any timely filed objections to the entry of the Proposed Final Order.  The Debtor shall promptly serve a copy of this Interim Order and a notice of the Final Hearing by regular mail upon (a) the parties that were provided notice of the Interim Hearing; and (b) any party that has filed prior to such date a request for notices with this Court.  Such notice shall state that objections to the entry of the Proposed Final Order shall be in writing and shall be filed with this Court no later than **[July __, 2025 at _:00 _.m.] (prevailing Eastern Time)**, which objections shall be served so as to be received on or before such date by (i) proposed counsel to the Debtor, (a) Goodwin Procter LLP, The New York Times Building, 620 Eighth Avenue, New York, NY 10018, Attn: Stacy A. Dasaro (SDasaro@goodwinlaw.com), Kizzy L. Jarashow (KJarashow@goodwinlaw.com), and James Lathrop (JLathrop@goodwinlaw.com), and (b) Potter Anderson & Corroon LLP, 1313 North Market Street, 6th Floor, P.O. Box. 951, Wilmington, DE 19801, Aaron H. Stulman (astulman@potteranderson.com); (ii) counsel to the DIP Lender, (a) Norton Rose Fulbright US

LLP, 1301 Avenue of the Americas, New York, NY 10019, Attn: Robert M. Hirsh (robert.hirsh@nortonorsefulbright.com) and Francisco Vazquez (francisco.vazquez@nortonorsefulbright.com), and (b) Morris James LLP, Eric J. Monzo (emonzo@morrisjames.com); and (iii) the Office of the U.S. Trustee for Region 3, 844 King Street, Suite 2207, Wilmington, DE 19801, Attn: Linda Casey (linda.casey@usdoj.gov). Any objections by creditors or other parties in interest to any of the provisions of the Proposed Final Order incorporating the terms of this Interim Order, or including any other or different provisions, shall be deemed waived unless filed and served in accordance with this paragraph.

46. **Retention of Jurisdiction**. This Court shall retain jurisdiction to hear, determine and, if applicable, enforce the terms of, any and all matters arising from or related to the DIP Loan Documents and/or this Interim Order.

ACTIVE/201263025.8

**Exhibit 1**

**Initial DIP Budget**

Charter School Capital, Inc.
United States Bankruptcy Court for the District of Delaware
Case # 25-11016
Restructuring Budget

| | Budget 1 | Budget 2 | Budget 3 | Budget 4 | Budget 5 | Budget 6 | Budget 7 | Budget 8 | Pre-Closing/Sale Budget Thru Wk 8 |
|---|---|---|---|---|---|---|---|---|---|
| Week # | | | | | | | | | |
| Week Ending | 6/13/2025 | 6/20/2025 | 6/27/2025 | 7/4/2025 | 7/11/2025 | 7/18/2025 | 7/25/2025 | 8/1/2025 | |
| BB Cash | $1,289,470 | $839,053 | $646,768 | $96,274 | $572,026 | $895,657 | $1,503,679 | $550,169 | $1,289,470.35 |
| Total Sources (Cash In) | 156,788 | 94,750 | 248,131 | 755,500 | - | 248,829 | 147,555 | 2,417 | 1,653,971 |
| **Uses** | | | | | | | | | |
| Money To Run - Purchases | | | 110,000 | 1,160,000 | 470,000 | 1,230,000 | 170,000 | 100,000 | 3,240,000 |
| Operating Disbursements | 420,206 | 96,235 | 328,625 | 109,748 | 376,369 | 125,807 | 418,065 | 89,145 | 1,964,200 |
| *Restructuring disbursements* | | | | | | | | | |
| BK Counsel - Debtor | 150,000 | 150,000 | 250,000 | 250,000 | 200,000 | 200,000 | 150,000 | 150,000 | 1,500,000 |
| Claims Agent | 10,000 | 10,000 | 10,000 | 5,000 | 5,000 | 5,000 | 5,000 | 5,000 | 55,000 |
| Financial Advisor/IB - Debtor | 25,000 | 25,000 | 25,000 | 50,000 | 50,000 | 25,000 | 25,000 | 50,000 | 275,000 |
| UST Fees | 2,000 | 800 | | | | | 33,000 | | 35,800 |
| KERP | | | | | | | 250,000 | | 250,000 |
| Independent Director Fees | | | | 5,000 | | 5,000 | | 5,000 | 20,000 |
| DIP Counsel Primary/Local | | 5,000 | 75,000 | 75,000 | 75,000 | 50,000 | 50,000 | 50,000 | 375,000 |
| DIP Fees | | | | 125,000 | | | | | 125,000 |
| Restructuring Disbursements | 187,000 | 190,800 | 360,000 | 510,000 | 330,000 | 285,000 | 513,000 | 260,000 | 2,635,800 |
| Total Uses | 607,206 | 287,035 | 798,625 | 1,779,748 | 1,176,369 | 1,640,807 | 1,101,065 | 449,145 | 7,840,000 |
| DIP Funding | - | - | - | 1,500,000 | 1,500,000 | 2,000,000 | - | - | 5,000,000 |
| EB Cash | $839,053 | $646,768 | $96,274 | $572,026 | $895,657 | $1,503,679 | $550,169 | $103,441 | $103,441 |

| DIP Loan | | 6/27/2025 | 7/4/2025 | 7/11/2025 | 7/18/2025 | 7/25/2025 | 8/1/2025 | |
|---|---|---|---|---|---|---|---|---|
| Beginning Balance | | $ - | $ - | 1,500,000 | 3,000,000 | 5,000,000 | 5,000,000 | $ - |
| Additions | | 1,500,000 | 1,500,000 | 1,500,000 | 2,000,000 | - | - | 5,000,000 |
| Accrued Interest | | | | | | | 50,000 | 50,000 |
| Repayment | | | | | | | - | - |
| Ending Balance | | $ - | 1,500,000 | 3,000,000 | 5,000,000 | 5,000,000 | 5,050,000 | $ 5,050,000 |

**Exhibit 2**

**DIP Term Sheet**

*Execution Version*

## CHARTER SCHOOL CAPITAL, INC.

**Senior Secured Superpriority**
**Debtor-in-Possession Credit Facility Term Sheet**

**Dated as of June 28, 2025**

This Senior Secured Superpriority Debtor-in-Possession Credit Facility Term Sheet (this "**Term Sheet**") describes the principal terms and conditions of a proposed senior secured superpriority debtor-in-possession term loan facility (the "**DIP Credit Facility**") to be provided by the DIP Lender (as defined below) to Charter School Capital, Inc., a Delaware corporation (the "**Borrower**") in connection with case (the "**Chapter 11 Case**") filed by the Borrower in the United States Bankruptcy Court for the District of Delaware (the "**Bankruptcy Court**") pursuant to chapter 11 of title 11 of the United States Code (as amended, the "**Bankruptcy Code**") on June 8, 2025 (the "**Petition Date**"). The DIP Credit Facility is being provided by the DIP Lender in reliance upon the promulgation and consummation of the 363 Sale Process (as defined below).

This Term Sheet is being provided on a confidential basis and it, along with its contents and existence, may not be distributed, disclosed or discussed with any other party other than (i) the Borrower's directors, officers, employees, accountants, attorneys and other professional advisors retained by the Borrower in connection with the transactions contemplated hereby and (ii) in a Bankruptcy Court filing in connection with the Chapter 11 Case. This Term Sheet is not an offer for the purchase, sale, or subscription or invitation of any offer to buy, sell or to subscribe for any securities. The terms and conditions set forth in this Term Sheet do not constitute or create an agreement, obligation or commitment of any kind by or on behalf of any party, unless and until executed by each of the undersigned parties hereto. Each of the Borrower and the DIP Lender agree and acknowledge that the failure to enter into definitive documentation with respect to the transactions contemplated hereby (such documentation, the "**Definitive Documentation**") shall in no event have an impact on, or operate in derogation of, the binding nature and the enforceability of this Term Sheet except as set forth under the heading "Conditions Precedent to Subsequent DIP Loans."

| | |
|---|---|
| **BORROWER:** | Charter School Capital, Inc., a Delaware corporation, in its capacity as a debtor and debtor-in-possession under the Bankruptcy Code. |
| **DIP LENDER:** | East West Bank (the "**DIP Lender**"). |
| **DIP CREDIT FACILITY:** | The DIP Lender agrees to make senior secured superpriority debtor-in-possession loans to the Borrower consisting of delayed-draw term loans to be made from time to time during the Availability Period (as defined below) in accordance with the Draw Schedule set forth below in an aggregate principal amount not to exceed at any time outstanding aggregate principal commitments of $5,000,000 (the "**DIP Commitment**"), upon compliance with the conditions set forth in this Term Sheet under the heading "Conditions Precedent to Subsequent DIP Loans." |
| **AVAILABILITY PERIOD:** | The DIP Credit Facility shall be available from the Interim Closing Date to the earliest of (i) the Maturity Date (as defined below) and (ii) the date of the termination of the DIP Credit Facility pursuant to the terms hereof or the DIP Orders (as defined below) (the "**Availability Period**"). Borrower may request draws under the |

<table>
<tr><td></td><td>DIP Credit Facility in accordance with the following schedule by delivering a notice of borrowing to the DIP Lender (the "<strong>Notice of Borrowing</strong>"), duly executed by an authorized officer of Borrower (the "<strong>Draw Schedule</strong>"):</td></tr>
</table>

|  | DIP Credit Facility in accordance with the following schedule by delivering a notice of borrowing to the DIP Lender (the "**Notice of Borrowing**"), duly executed by an authorized officer of Borrower (the "**Draw Schedule**"):<br><br>(a)   <u>Interim DIP Loan</u>:  On or after the date of an order approving the DIP Credit Facility on an interim basis (the "**Interim Order**"), Borrower may request loans in an amount not to exceed $2,500,000, subject to the provisions of this Term Sheet, the Interim Order, and the Approved Budget (as defined below) (the "**Interim DIP Loans**"); and<br><br>(b)   <u>Subsequent DIP Loans</u>:   On or after the date of an order approving the DIP Credit Facility on a final basis (the "**Final Order**"), Borrower may request loans in one or more borrowings of no less than $1,000,000 not to exceed the DIP Commitment, less amounts drawn under the Interim DIP Loans (the "**Subsequent DIP Loans**" and, together with the Interim DIP Loans, the "**DIP Loans**"), subject to the provisions of this Term Sheet, the Final Order, and the Approved Budget.<br><br>The proceeds of the DIP Loans shall be funded into a deposit account of the Borrower.  Such account shall be subject to the DIP Liens (as defined below) in favor of the DIP Lender, which shall be perfected pursuant to the DIP Orders. |
|---|---|
| **USE OF PROCEEDS:** | The DIP Loans will be used strictly in accordance with the Approved Budget (subject to the Permitted Variances (as defined below)), for (i) working capital and general corporate purposes of the Borrower, (ii) for bankruptcy-related costs and expenses, and (iii) for costs and expenses related to the DIP Credit Facility. |
| **APPROVED BUDGET; APPROVED CASH FLOW PROJECTION; VARIANCE REPORTS:** | The Borrower has delivered to the DIP Lender a weekly budget on a consolidated basis for the 13-week period commencing on the week of June 30, 2025, which is hereby approved by the DIP Lender (the "**Approved Budget**").<br><br>By no later than 5:00 PM (Eastern Time) on Thursday after the second (2nd) full calendar week following the entry of the Interim Order (the "**Interim Order Entry Date**" and such testing date, the "**First Testing Date**"), and no later than 5:00 PM (Eastern Time) on each Thursday thereafter (together with the First Testing Date, each a "**Testing Date**"), the Borrower shall deliver to the DIP Lender, in a form consistent with the form of the Approved Budget, a variance report comparing the Borrower's actual receipts and disbursements by line item for the prior calendar week, beginning with the fourth (4th) week after the Interim Order Entry Date, and the prior four (4) calendar weeks (on a cumulative basis) with the projected receipts and disbursements for such week and, beginning with the fourth (4) calendar week after the Interim Order Entry Date, |

2

the prior four (4) calendar weeks (on a cumulative basis) as reflected in the applicable Approved Budget for such weeks (the "**Weekly Variance Report**").

By not later than 5:00 PM Eastern Time on the First Testing Date and on each Thursday thereafter that is the four-week (4-week) anniversary of the First Testing Date (each such date, a "**Monthly Variance Testing Date**" and each such four-week period, the "**Monthly Testing Period**"), the Borrower shall provide to the DIP Lender a report detailing (i) the aggregate disbursements of the Borrower and aggregate receipts during the applicable Monthly Testing Period for all operating disbursements; and (ii) any variance (whether positive or negative, expressed as a percentage) between the aggregate disbursements made during such Monthly Testing Period by the Borrower against the aggregate disbursements for the Monthly Testing Period, as set forth in the applicable Approved Budget (a "**Monthly Variance Report**," together with the Weekly Variance Report, the "**Approved Variance Reports**").

The Borrower shall comply with the following (collectively, the "**Permitted Variances**"):

As of any Monthly Variance Testing Date, for the Monthly Testing Period ending on the Sunday preceding such Monthly Variance Testing Date, the Borrower shall not allow without the DIP Lender's approval: all operating disbursements (excluding professional fees and restructuring charges arising on account of the Chapter 11 Case (including United States Trustee fees and professional fees and expenses incurred by the DIP Lender or any privacy ombudsman)) to be greater than 120% of the estimated disbursement for such items in the Approved Budget, each for such Monthly Testing Period provided that, if disbursements are below the budgeted disbursements for a Monthly Testing Period, any such unused disbursements shall be rolled into the Approved Budget for the following next Monthly Testing Period. Any material changes to the Approved Budget, shall be subject to the DIP Lender's approval. For the avoidance of doubt, any reference to "written consent" hereunder shall include consent granted by email.

Commencing at 5:00 P.M. (Eastern Time) on the Thursday of the fourth full calendar week after the Interim Order Entry Date, and continuing at 5:00 P.M. (Eastern Time) on the Thursday of every fourth (4th) week thereafter, the weekly budget shall be updated, and if such updated budget is in form and substance satisfactory to the DIP Lender, it shall become the "Approved Budget" for purposes of this Term Sheet and the DIP Orders. Any amendments, supplements, or modifications to the Approved Budget or an Approved Variance Report shall be subject to the prior written approval of the DIP Lender prior to the implementation thereof. If the DIP Lender has not objected, in writing, to a proposed updated budget, or an amendment, supplement, or modification to the

3

|  | Approved Budget or an Approved Variance Report, within three (3) business days after the DIP Lender's receipt thereof, such proposed updated budget, amendment, supplement, or modification shall be deemed acceptable to and approved by the DIP Lender.  Until any such updated budget, amendment, supplement, or modification has been approved by the DIP Lender, the Borrower shall be subject to and be governed by the terms of the Approved Budget then in effect. |
|---|---|
| **DIP LENDER CALLS:** | The Borrower shall participate in a weekly call with the DIP Lender and the DIP Lender's advisors at a time to be mutually agreed to discuss the Borrower's business, operations, sale process, and general case status. |
| **FIRST PRIORITY SECURITY INTEREST:** | All DIP Loans and other liabilities and obligations owed to the DIP Lender under or in connection with this Term Sheet and the Interim Order and/or Final Order, (collectively, the "**DIP Obligations**"), in all cases subject to the "**Carve Out**" (as defined in the DIP Orders), shall be: |
|  | (i)      pursuant to section 364(c)(1) of the Bankruptcy Code, entitled to superpriority administrative expense claim status in the Chapter 11 Case of the Borrower with priority over any and all administrative expenses, whether heretofore or hereafter incurred, of the kind specified in sections 503(b) or 507(a) of the Bankruptcy Code; |
|  | (ii)     pursuant to sections 364(c)(2) secured by a perfected first-priority lien on the DIP Collateral (as defined below) granted in favor of the DIP Lender; |
|  | (iii)    pursuant to section 364(c)(3), secured by a perfected junior lien on DIP Collateral granted in favor of the DIP Lender, to the extent such DIP Collateral is subject to a prepetition lien; and |
|  | (iv)    pursuant to section 364(d)(1), secured by a perfected first-priority priming lien on DIP Collateral granted in favor of the DIP Lender, senior to all other liens (collectively, the liens described in clauses (ii), (iii) and (iv), the "**DIP Liens**"). |
| **DIP COLLATERAL:** | "**DIP Collateral**" means, collectively, all assets of the Borrower and its bankruptcy estate of any nature whatsoever and wherever located, whether first arising prior to or following the Petition Date, now owned or hereafter acquired, including all accounts, chattel paper, commercial tort claims, deposit accounts, documents, equipment, general intangibles, goods, instruments, inventory, investment property, letter-of-credit rights, real property, books and records, and all proceeds, rents, profits, and offspring of the foregoing, other than (i) assets, contracts, leases, and other licenses solely to the extent a DIP Lien is not permitted by law to attach to such property, in which case the proceeds of such assets, contracts, |

US-DOCS\161034655.2ACTIVE/201243916.4

| | leases, and other licenses shall be DIP Collateral and (ii) avoidance actions under chapter 5 of the Bankruptcy Code, provided that DIP Collateral shall include proceeds of avoidance actions upon entry of the Final Order. |
| --- | --- |
| | All of the liens granted to the DIP Lender in the DIP Collateral shall be effective and perfected by the Interim Order and the Final Order and without the necessity of the execution of mortgages, security agreements, pledge agreements, financing statements, or other agreements.  Notwithstanding the foregoing, the Borrower shall take all action that may be reasonably necessary or desirable, or that the DIP Lender may reasonably request, to at all times maintain the validity, perfection, enforceability, and priority of the security interest and liens of the DIP Lender in the DIP Collateral, or to enable the DIP Lender to protect, exercise or enforce its rights hereunder, under the DIP Orders and in the DIP Collateral. |
| **FEES:** | 2.5% upfront fee on total DIP Commitment, earned, non-refundable, and allowed on a final basis upon entry of the Interim Order and payable from the proceeds of the Interim DIP Loan draw (the "**Upfront Fee**"). |
| | Except as provided in the section titled "Optional Prepayments", 5% exit fee on the total DIP Commitment, earned, non-refundable, and allowed on a final basis upon entry of the Interim Order and paid in cash upon the repayment of the DIP Loans (including voluntary prepayments), the termination of the DIP Commitment, or upon the acceleration of the DIP Loans following an Event of Default (the "**Exit Fee**"). |
| | 2% extension fee on the total DIP Commitment, earned, non-refundable, and allowed upon the Borrower's request to extend the Initial Maturity Date (as defined below) (the "**Extension Fee**").  The Extension Fee will be paid in kind by adding such Extension Fee to the principal amount of the DIP Loans. |
| **INTEREST RATE:** | Interest will be payable on the unpaid principal amount of all DIP Loans and all overdue interest thereon at a rate per annum equal to 12%, payable and the end of such interest period in arrears in kind by adding such interest to the principal amount of such DIP Loans. All interest and fees under this Term Sheet shall be calculated on the basis of a 360-day year for the actual number of days elapsed.  All accrued interest which for any reason has not theretofore been paid shall be paid in full on the date on which the final principal amount of the DIP Loans is paid. |
| **DEFAULT RATE:** | At all times automatically following the occurrence and during the continuance of an Event of Default, principal, interest, and all other amounts due on the DIP Loans shall bear interest at a rate equal to |

US-DOCS\161034655.2ACTIVE/201243916.4

| | |
|---|---|
| | 2.00% per annum in excess of the interest rate set forth under "Interest Rate" above. |
| **363 SALE PROCESS:** | The Borrower shall continue a public sale process with respect to substantially all of their assets pursuant to section 363 of the Bankruptcy Code (collectively, the "**Sales**"). In connection with the Sales, the Borrower, in consultation with the DIP Lender, if any, may designate stalking horse purchasers (collectively, the "**Stalking Horse Purchasers**") for some or all of the Borrower's assets. Any asset purchase agreement entered into between the Borrower and a Stalking Horse Purchaser shall be referred to as a Stalking Horse APA.<br><br>The process set forth above, including the Sales, the designation of the Stalking Horse Purchasers, and the use of the Stalking Horse APAs, shall collectively be referred to as the "**363 Sale Process**." |
| **MATURITY DATE:** | The DIP Loans (together with all other DIP Obligations) shall mature and be due and payable on the earliest to occur of the following (such date, the "**Maturity Date**"):<br><br>(i)    August 6, 2025 (the "**Initial Maturity Date**"), which Initial Maturity Date may be extended for 30 calendar days upon request by the Borrower subject to payment of the Extension Fee;<br><br>(ii)   28 calendar days after the Interim Order Entry Date if the Final Order has not been entered by the Bankruptcy Court on or before such date, or otherwise extended by agreement of the DIP Lender;<br><br>(iii)  Five (5) days after the termination of a Stalking Horse APA for any reason, other than (a) as a result of (1) any breach of a Stalking Horse APA by the Purchaser (as defined in the Stalking Horse APA) or (2) the Borrower's selection of an alternative bid that either has (A) the consent of the DIP Lender or (2) results in the indefeasible payment in full in cash of the DIP Obligations, in each case, as of the closing of such alternative bid or (b) a termination to pursue approval of an Alternative Transaction (as defined in the Stalking Horse APA) that results in the indefeasible payment in full in cash of the DIP Obligations as of the closing of such Alternative Transaction;<br><br>(iv)   the date of consummation of any sale of all or substantially all of the assets of the Borrower pursuant to section 363 of the Bankruptcy Code;<br><br>(v)    the substantial consummation (as defined in section 1101 of the Bankruptcy Code and which for purposes hereof shall be no later than the "effective date" thereof) of a plan of |

|  | reorganization filed in the Chapter 11 Case that is confirmed pursuant to an order entered by the Bankruptcy Court; |
|  | (vi)   entry of an order by the Bankruptcy Court approving (a) a motion seeking conversion or dismissal of the Chapter 11 Case or (b) a motion seeking the appointment or election of a trustee, a responsible officer, or examiner with enlarged powers relating to the operation of the Borrower's business; |
|  | (vii)  the date, if any, on which the Bankruptcy Court orders the conversion of the Chapter 11 Case to a liquidation pursuant to Chapter 7 of the Bankruptcy Code; and |
|  | (viii) the date of acceleration of all or any portion of the DIP Loans and the termination of the DIP Commitment in respect thereof upon the occurrence of an Event of Default (as defined below). |
|  | Notwithstanding anything in this Term Sheet or the DIP Orders to the contrary, simultaneously with the consummation of any Alternative Transaction that results in the occurrence of the Maturity Date pursuant to clause (iii) above, the Borrower shall pay (or cause to be paid), subject to the Carve Out, the outstanding amount of the DIP Loans (together with all other DIP Obligations) from the proceeds of such Alternative Transaction reserving proceeds (x) sufficient to pay accrued, unpaid, and allowed administrative expenses (as of the date of the closing of such Alternative Transaction) to the extent set forth in the Approved Budget and (y) in an amount negotiated in good faith by the DIP Lender and the Borrower that is necessary to fund costs for the wind-down of Borrower's bankruptcy estates following the closing of such Alternative Transaction. |
| **OPTIONAL PREPAYMENTS:** | The Borrower may prepay the DIP Loans in whole or in part at any time upon delivery of written notice to the DIP Lender no later than 1:00 PM (Eastern Time) three (3) business days prior to the date of such prepayment (or such later time as the DIP Lender may agree to acting reasonably); *provided* any such prepayments shall be subject to the Exit Fee on the portion of the DIP Loans so repaid.  All optional prepayments shall be applied to the DIP Loans in accordance with the application of payment provisions set forth in the "Mandatory Prepayments" section below.  Any amounts so prepaid may not be reborrowed. |
| **MANDATORY PREPAYMENTS; APPLICATION OF PAYMENTS:** | Prior to the occurrence of an Event of Default, upon receipt of proceeds described in clauses (i) through (ii) below, the Borrower shall remit to the DIP Lender to pay or prepay, to the extent provided below, the DIP Obligations (together with a cash reserve established by the DIP Lender to cover asserted contingent and indemnity obligations) in each case owed to applicable DIP Lender specified |

7

| | in clauses (i) through (ii) below, ratably and to the extent specified below, until such obligations are paid in full as follows: |
|---|---|
| | (i)  100% of the net cash proceeds of any sale or disposition of all or substantially all of Borrower's assets pursuant to section 363 of the Bankruptcy Code (other than Sales to the Stalking Horse Purchaser pursuant to the Stalking Horse APAs) simultaneous with the consummation thereof, after funding the Carve Out and reserving proceeds sufficient to pay accrued, unpaid, and allowed administrative expenses (as of the closing of such Sale) to the extent set forth in the Approved Budget; and |
| | (ii)  100% of the net cash proceeds received as a result of the Borrower incurring or issuing any indebtedness that is not expressly permitted to be incurred or issued pursuant to this Term Sheet, provided that Borrower shall be permitted to extend trade credit in the ordinary course of business. |
| | Any amounts so paid or prepaid may not be reborrowed.  No reinvestment of the proceeds of any extraordinary receipts, asset sales, or other proceeds described above shall be permitted without the prior written consent of the DIP Lender. |
| **CONDITIONS PRECEDENT TO THE INTERIM DIP LOAN:** | The obligations of the DIP Lender to make the Interim DIP Loans in accordance with the Draw Schedule will be subject to satisfaction, or written waiver, by the DIP Lender, of each of the following conditions precedent in connection with each draw request (the date on which such conditions shall have been satisfied or waived in accordance with this Term Sheet, the ("**Interim Closing Date**"). |
| | (i)  Borrower shall have timely delivered to the DIP Lender the Approved Budget or any update thereto required to be delivered in accordance with this Term Sheet; |
| | (ii)  Borrower shall have delivered to the DIP Lender a Notice of Borrowing in connection with such draw request no later than 1:00 PM (Eastern Time) one day prior to the requested funding date for the Interim DIP Loan (or such later time as the DIP Lender may agree to); |
| | (iii)  the Interim Order (in form and substance reasonably acceptable to the DIP Lender and consistent with this Term Sheet) has been entered by the Bankruptcy Court (after a hearing on notice to all parties having or asserting a lien on all or any portion of the DIP Collateral) and shall not have been reversed, modified, amended, stayed, or vacated, or in the case of any modification or amendment, in a manner without the consent of the DIP Lender and the Borrower shall be in compliance in all respects with the Interim Order; |

US-DOCS\161034655.2ACTIVE/201243916.4

(iv)    the Interim Order shall provide that the liens and security interests of the DIP Lender in the DIP Collateral have been perfected by the Interim Order and without the necessity of the execution of mortgages, security agreements, pledge agreements, financing statements, or other agreements and shall constitute first-priority liens (subject only to the Carve Out);

(v)    no Default or Event of Default under the DIP Credit Facility or under the Interim Order or Final Order, as applicable, shall have occurred and be continuing on the Interim Closing Date or after giving effect to the Interim DIP Loan;

(vi)    all representations and warranties of the Borrower hereunder shall be true and correct in all material respects (except those qualified by materiality or Material Adverse Change (as defined below), which shall be true and correct in all respects);

(vii)    subject to Bankruptcy Court approval, (a) the Borrower shall have the corporate power and authority to make, deliver, and perform its obligations under this Term Sheet and the Interim Order and (b) no consent or authorization of, or filing with, any person (including, without limitation, any governmental authority) shall be required in connection with the execution, delivery, or performance by the Borrower, or for the validity or enforceability in accordance with its terms against the Borrower, of this Term Sheet and the Interim Order except for consents, authorizations, and filings which shall have been obtained or made and are in full force and effect and except for such consents, authorizations, and filings, the failure to obtain or perform, could not reasonably be expected to cause a Material Adverse Change (as defined below); and

(viii)    substantially concurrently with the Interim Closing Date, all budgeted fees and out-of-pocket expenses of the DIP Lender relating to the DIP Credit Facility (including, without limitation, reasonable fees and expenses of their counsel and external advisors) shall have been paid in full (or will be paid in connection with such Interim DIP Loan draw) to the extent an invoice has been delivered to the Borrower at least twenty-four (24) hours in advance.

Modifications of the Interim Order shall require the prior written consent of the DIP Lender.

For the purposes of this Term Sheet, "**Material Adverse Change**" shall mean: after the Interim Order Entry Date, a material adverse change in, (a) the business, operations, properties, liabilities, or financial condition of Borrower and its subsidiaries, taken as a whole, (b) the ability of the Borrower to perform its obligations under the Term Sheet, (c) the validity or enforceability against the

9

| | |
|---|---|
| | Borrower of the Term Sheet, or (d) the rights and remedies of the DIP Lender hereunder or thereunder. |
| **CONDITIONS PRECEDENT TO SUBSEQUENT DIP LOANS:** | The obligations of the DIP Lender to make a Subsequent DIP Loans shall be subject to satisfaction or waiver of each of the following conditions:<br><br>(i) the receipt by the DIP Lender of a Notice of Borrowing no later than 1:00 PM (Eastern Time) one (1) business day prior to the requested funding date for such Subsequent DIP Loans;<br><br>(ii) all representations and warranties being true and correct in all material respects (except those qualified by materiality or Material Adverse Change, which shall be true and correct in all respects);<br><br>(iii) no Default or Event of Default under the DIP Credit Facility, or Interim Order or Final Order, as applicable, then existing or after giving effect to such Subsequent DIP Loans; and<br><br>(iv) the proceeds of such Subsequent DIP Loans shall be applied in a manner consistent with the Approved Budget and any Permitted Variances thereto. |
| **SEGREGATED ACCOUNT:** | The DIP Lender shall maintain a segregated account for receivables purchased by the Borrower to finance charter schools, the proceeds of which account shall be disbursed to the Borrower in accordance with the Approved Budget with the balance to be used to pay the DIP Obligations to the extent not otherwise paid on or before the Maturity Date. |
| **REPRESENTATIONS AND WARRANTIES:** | On the date hereof, the Borrower represents and warrants to the DIP Lender that:<br><br>(i)    Subject to any restrictions arising on account of the Borrower's status as a "debtor" under the Bankruptcy Code and the entry of the DIP Orders, the Borrower (a) is a corporation incorporated, organized, validly existing, and in good standing under the laws of the jurisdiction of its organization, (b) has all requisite power and authority to own its property and assets and to carry on its business as now conducted, (c) is qualified to do business in each jurisdiction where such qualification is required, except where the failure so to qualify would not reasonably be expected to have a material adverse effect, and (d) has the power and authority to execute, deliver, and perform its obligations under this Term Sheet and, in the case of the Borrower, to borrow and otherwise obtain credit hereunder.<br><br>(ii)    Subject to any restrictions arising on account of the Borrower's status as a "debtor" under the Bankruptcy Code and the entry of the DIP Orders, the execution, delivery, and |

10

performance by the Borrower of this Term Sheet and the borrowings hereunder (a) has been duly authorized by all corporate action required to be obtained by the Borrower and (b) will not violate (1) any provision of law, statute, rule, or regulation applicable to the Borrower, (2) the certificate or articles of incorporation or other constitutive documents of the Borrower, or (3) any applicable order of any court or any rule, regulation or order of any governmental authority applicable to the Borrower.

(iii)   This Term Sheet has been duly executed and delivered by the Borrower and constitutes, upon entry of the applicable DIP Order, a legal, valid, and binding obligation of the Borrower, enforceable against the Borrower, in accordance with its terms, subject to (a) any restrictions arising on account of the Borrower status as a "debtor" under the Bankruptcy Code and the entry of the DIP Orders and the effects of other bankruptcy, insolvency, moratorium, reorganization, fraudulent conveyance, or other similar laws affecting creditors' rights generally, (b) general principles of equity (regardless of whether such enforceability is considered in a proceeding in equity or at law), (c) implied covenants of good faith and fair dealing, and (d) any foreign laws, rules and regulations as they relate to pledges of equity interests of foreign subsidiaries that are not party hereto.

(iv)   Subject to any restrictions arising on account of the Borrower's status as a "debtor" under the Bankruptcy Code and the entry of the DIP Orders other than the Chapter 11 Case, (a) there are no actions or suits or proceedings at law or in equity or by or on behalf of any governmental authority or in arbitration now pending, or, to the knowledge of the Borrower, threatened in writing against the Borrower or any business, property, or rights of any such person that would reasonably be expected to have, individually or in the aggregate, a material adverse effect, other than any threatened litigation by Orthogon Charter School Special Opportunities LLP, Orthogon Charter School Special Opportunities II, LP and Orthogon Charter School Special Opportunities III, LLC (collectively "**Orthogon**") included in Orthogon's objection filed at Docket No. 55 of the Chapter 11 Case, and (b) none of the Borrower and its properties or assets is in violation of any law, rule, or regulation or is in default with respect to any judgment, writ, injunction, or decree of any governmental authority, where such violation or default would reasonably be expected to have, individually or in the aggregate, a material adverse effect.

(v)   [Reserved]

11

<table>
<tr>
<td></td>
<td>

(vi)    The Borrower is not required to be registered as an "investment company" within the meaning of the Investment Company Act of 1940, as amended.

(vii)    (a) The Borrower is in compliance in all material respects with the material provisions of the USA PATRIOT Act, (b) none of the Borrower, nor to the knowledge of the Borrower, any director, officer, agent, employee or affiliate of the Borrower is currently subject to any U.S. sanctions administered by the Office of Foreign Assets Control of the U.S. Treasury Department or the U.S. Treasury Department, the European Union or relevant member states of the European Union, the United Nations Security Council or His Majesty's Treasury, and (c) the Borrower will not directly or indirectly use the proceeds of the loans or otherwise make available such proceeds to any person, for the purpose of financing the activities of any person that is currently the target of any sanctions.

(viii)    (a) The Borrower, and to the knowledge of the Borrower, any of their directors, officers, agents or employees, are in compliance with the U.S. Foreign Corrupt Practices Act of 1977 in all material respects and (b) no part of the proceeds of the loans made hereunder will be used to make any unlawful bribe, rebate, payoff, influence, payment, kickback or other unlawful payment.

</td>
</tr>
<tr>
<td>

**AFFIRMATIVE COVENANTS:**

</td>
<td>

The Borrower covenants and agrees that, as of the date hereof until the termination of this Term Sheet, unless the DIP Lender shall otherwise consent in writing, that the Borrower will, and will cause each of its subsidiaries to:

(i)    (a) Do or cause to be done all things necessary to preserve, renew, and keep in full force and effect its legal existence and (b) except where failure to do so would not reasonably be expected to have a material adverse effect, do or cause to be done all things necessary to (1) lawfully obtain, preserve, renew, extend, and keep in full force and effect the permits, franchises, authorizations, intellectual property, licenses and rights with respect thereto necessary to the normal conduct of its business and (2) at all times maintain, protect and preserve all property necessary to the normal conduct of its business and keep such property in good repair, working order and condition (ordinary wear and tear excepted), from time to time make, or cause to be made, all needful and proper repairs, renewals, additions, improvements and replacements thereto necessary in order that the business carried on in connection therewith, if any, may be properly conducted at all times.

</td>
</tr>
</table>

12

| | | |
|---|---|---|
| | (ii) | Comply with all laws, rules, regulations and orders of any governmental authority applicable to it or its property, except where the failure to do so, individually or in the aggregate, would not reasonably be expected to result in a material adverse effect. |
| **NEGATIVE COVENANTS:** | | The Borrower covenants and agrees that, as of the date hereof until the termination of this Term Sheet, unless the DIP Lender shall otherwise consent in writing, the Borrower will not, and will not permit any of its subsidiaries to: |
| | (i) | Incur, create, assume, or permit to exist any indebtedness for borrowed money except: (a) indebtedness created under this Term Sheet, (b) indebtedness of the Borrower and its subsidiaries in existence prior to the date hereof, (c) indebtedness among the Borrower or its subsidiaries to the Borrower or its subsidiaries, and (d) the deferred purchase price of goods and services in the ordinary course of business. |
| | (ii) | Create, incur, assume, or permit to exist any lien securing obligations for borrowed money of the Borrower or any Subsidiary, except (a) any liens created under the Term Sheet and (b) liens on property or assets of the Borrower and its subsidiaries in existence prior to the date hereof. |
| | (iii) | Purchase or otherwise acquire (a) all or substantially all of the property and assets or business of another person or (b) assets constituting a business unit, line of business or division of such person or otherwise make an investment in any person except (1) investments amongst the Borrower and its subsidiaries (2) investments in existence prior to the date hereof, and (3) the extension of trade credit in the ordinary course of business. |
| | (iv) | Declare or pay any dividend or make any other distribution except for payments made by the Borrower and its subsidiaries to the Borrower or its subsidiaries. |
| | (v) | Sell or transfer any property or assets to or purchase or acquire any property or assets from, or otherwise engage in any other transaction with any of its affiliates except for transactions that are on terms that are substantially no less favorable to the Borrower or such subsidiary, as applicable, than would be obtained in a comparable arm's-length transaction with a person that is not an affiliate. |
| | (vi) | Enter into any arrangement, directly or indirectly, with any person whereby it shall sell or transfer any property, real or personal, used or useful in its business, whether now owned or hereafter acquired, and thereafter, as part of such |

13

| | |
|---|---|
| | transaction, rent or lease such property or other property that it intends to use for substantially the same purpose or purposes as the property being sold or transferred except sales or transfers of any property or assets that are worn out or obsolete in the ordinary course of business. |
| | (vii)  Engage at any time to any material respect in any business or business activity substantially different from any business or business activity conducted by the Borrower and its subsidiaries on the date of the Interim Order. |
| | For the avoidance of doubt, nothing contained herein shall be deemed to restrict the Borrower from continuing to operate its business in the ordinary course, including its receivables financing business. |
| **EVENTS OF DEFAULT:** | Each of following shall constitute an "**Event of Default**": |
| | (i)  the entry of an Interim Order or Final Order in form or substance that is not acceptable to the DIP Lender in its discretion; |
| | (ii)  failure by the Borrower to be in compliance in all material respects with provisions of this Term Sheet and/or the DIP Orders; |
| | (iii)  any request made by the Borrower for, or the reversal, modification, amendment, stay, reconsideration, or vacatur of a DIP Order, as entered by the Bankruptcy Court, without the prior written consent of the DIP Lender; |
| | (iv)  failure of any representation or warranty to be true and correct in all material respects (or, to the extent qualified by materiality or Material Adverse Change, in all respects) when made; |
| | (v)  the filing of any application by Borrower or any of its affiliates (other than the application for financing provided by a third party which seeks authority to pay all of the DIP Obligations in full upon entry of the order approving such financing) for the approval of (or an order is entered by the Bankruptcy Court approving) any claim arising under section 507(b) of the Bankruptcy Code or any other provision of the Bankruptcy Code or any security, mortgage, collateral interest, or other lien in the Chapter 11 Case which is *pari passu* with or senior to the DIP Liens, excluding liens arising under the DIP Orders, or pursuant to any other financing agreement made with the prior written consent of the DIP Lender; |
| | (vi)  the commencement of any action by the Borrower or other authorized person (other than an action permitted by the DIP |

14

Orders) against the DIP Lender or any of its agents and employees to subordinate or avoid any liens made in connection with the DIP Orders;

(vii)   (a) the Borrower or any of its affiliates files a pleading in any court seeking or supporting an order to revoke, reverse, stay, vacate, amend, supplement, or otherwise modify any DIP Order or the Term Sheet, or the disallowance of the DIP Obligations, in whole or in part or (b) any material provision of the DIP Orders or Term Sheet, or any other order of the Bankruptcy Court approving the Borrower's use of Cash Collateral (as defined in the DIP Orders), shall for any reason cease to be valid and binding (without the prior written consent of the DIP Lender);

(viii)  the filing with the Bankruptcy Court of a motion seeking approval of a sale under section 363 (other than as contemplated by the Sale Process) or a plan of reorganization or liquidation in the Chapter 11 Case that, in either case, does not provide for indefeasible payment in full in cash to the DIP Lender of DIP Loans and all other budgeted amounts outstanding under this Term Sheet or the DIP Orders on closing of such sale or the effective date of such plan;

(ix)    the appointment in the Chapter 11 Case of a trustee, receiver, examiner, or responsible officer with enlarged powers relating to the operation of the business of the Borrower (powers beyond those set forth in sections 1106(a)(3) and (a)(4) of the Bankruptcy Code);

(x)     the granting of relief from the automatic stay by the Bankruptcy Court to any other creditor or party in interest in the Chapter 11 Case with respect to any portion of the DIP Collateral;

(xi)    the conversion of the Chapter 11 Case into a case pursuant to chapter 7 of the Bankruptcy Code;

(xii)   the termination of any of the Borrower's exclusive right to propose a plan of reorganization under chapter 11 of the Bankruptcy Code;

(xiii)  a dismissal of the Chapter 11 Case;

(xiv)   failure to pay principal, interest, or other DIP Obligations in full when due, including without limitation, on the Maturity Date;

US-DOCS\161034655.2ACTIVE\201243916.4

| | |
|---|---|
| | (xv) any representation or warranty expressly made by the Borrower in this Term Sheet shall prove to have been false in a material respect when so made; and |
| | (xvi) failure to comply with any covenant set forth herein and such failure shall remain unremedied for a period of five business days after written notice thereof to Borrower. |
| **REMEDIES UPON EVENT OF DEFAULT:** | (i) Declare that the DIP Commitment is terminated, whereupon the DIP Commitment shall be terminated; |
| | (ii) Declare the unpaid amount of the DIP Obligations to be immediately due and payable, without presentment, demand, protest or other notice of any kind, all of which are hereby expressly waived by the Borrower; or |
| | (iii) Take any other action or exercise any other right or remedy (including, without limitation, with respect to the liens in favor of the DIP Lender) permitted under the DIP Order, or by applicable law. |
| | Any exercise of remedies by the DIP Lender shall be subject in all respects to the terms of the DIP Orders. |
| **OTHER BANKRUPTCY MATTERS:** | All out-of-pocket prepetition and postpetition reasonable and documented fees, costs, and expenses of the DIP Lender relating to the DIP Credit Facility, the Stalking Horse APAs, and the Chapter 11 Case (including, without limitation, prepetition and postpetition reasonable and documented fees and disbursements of counsel and advisors), subject to the DIP Orders, shall be payable by Borrower following written demand and without the requirement for Bankruptcy Court approval. |
| | Borrower shall indemnify, pay, and hold harmless the DIP Lender (and each of their respective directors, officers, members, employees, and agents) against any loss, liability, cost, or expense incurred in respect of the financing contemplated hereby or the use or the proposed use of proceeds thereof (except to the extent resulting from the bad faith, gross negligence, willful misconduct, or fraud of the indemnified party, as determined by a final, non-appealable judgment of a court of competent jurisdiction). |
| | The DIP Orders shall contain customary releases and exculpations for the DIP Lender (in any capacity), in form and substance reasonably satisfactory to the parties, respectively, including, without limitation, releases from any avoidance actions. |
| | The DIP Lender may credit bid any or all of the outstanding DIP Obligations (and any other applicable obligations) in connection with the Sale or any other non-ordinary course sale of the DIP Collateral pursuant to section 363 of the Bankruptcy Code, any plan |

16

| | or otherwise, including any deposit in connection with such sale, and such credit bidding rights shall not be limited for cause pursuant to section 363(k) of the Bankruptcy Code or otherwise. |
|---|---|
| **DIP ORDERS GOVERN:** | To the extent of any conflict or inconsistency between this Term Sheet and the DIP Orders, the DIP Orders shall govern. |
| **GOVERNING LAW AND JURISDICTION:** | The laws of the State of New York (except as governed by the Bankruptcy Code) shall govern this Term Sheet. Borrower shall submit to the exclusive jurisdiction of the Bankruptcy Court and shall waive any right to trial by jury. |
| **COUNTERPARTS AND ELECTRONIC TRANSMISSION:** | This Term Sheet may be executed in any number of counterparts and by different parties hereto on separate counterparts, each of which when so executed and delivered, shall be deemed an original, and all of which, when taken together, shall constitute one and the same instrument. Delivery of an executed counterpart of a signature page to this Term Sheet by facsimile, "PDF" or other electronic transmission shall be effective as delivery of a manually executed counterpart of this Term Sheet. |
| **COUNSEL TO DIP LENDER:** | Norton Rose and Fulbright US LLP and Morris James LLP |

[*Remainder of page intentionally left blank*]

**BORROWER**:

**CHARTER SCHOOL CAPITAL, INC.**, a Delaware corporation

By: _____

Name: Stuart Ellis

Title: CEO

**DIP LENDER**:

**EAST WEST BANK**

By: _____

Name: Edward Hirshfield

Title: SVP