# IN THE UNITED STATES BANKRUPTCY COURT
# FOR THE DISTRICT OF DELAWARE

|  |  |  |
|---|---|---|
| In re: | : | Chapter 11 |
|  | : |  |
| Charter School Capital, Inc.,[1] | : | Case No. 25-11016 (CTG) |
|  | : |  |
| Debtor. | : |  |
|  | : | **Re: Docket No. 57** |

## DECLARATION OF BRIAN AYERS IN SUPPORT OF DEBTOR'S EMERGENCY MOTION FOR ENTRY OF INTERIM AND FINAL ORDERS (A) AUTHORIZING DEBTOR TO OBTAIN POST-PETITION FINANCING AND TO GRANT SECURITY INTERESTS AND SUPER-PRIORITY ADMINISTRATIVE EXPENSE STATUS PURSUANT TO 11 U.S.C. §§ 105, 364(C) AND 364(D); (B) UTILIZE CASH COLLATERAL AND PAY CERTAIN RELATED FEES AND CHARGES; (C) MODIFYING THE AUTOMATIC STAY PURSUANT TO 11 U.S.C. § 362; AND (D) SCHEDULING A FINAL HEARING PURSUANT TO BANKRUPTCY RULE 4001

I, Brian Ayers, hereby declare that the following is true and correct to the best of my knowledge, information, and belief: [2]

1. I am a Managing Director of Rock Creek Advisors, LLC ("Rock Creek" or the "Firm"), which has an office at 1738 Belmar Blvd., Belmar, New Jersey 07719.

---

[1] The Debtor's mailing address is 9450 SW Gemini Dr, PMB 559064, Beaverton, OR 97008-7105, and the last four digits of the Debtor's federal tax identification number are 4278.

[2] Capitalized terms used but not defined herein shall have the meaning ascribed to them in the DIP Motion, the proposed interim order attached as Exhibit A thereto (the "Interim Order") or the *Declaration of Stuart Ellis in Support of Charter School Capital's Chapter 11 Petition and First Day Motions* (the "First Day Declaration").

2. I submit this declaration on behalf of the Debtor in support of the DIP Motion,[3] filed contemporaneously herewith. Through the DIP Motion, the Debtor seeks, among other things, approval of the senior secured superpriority debtor-in-possession term loan facility (the "DIP Facility") in an aggregate principal amount of up to $5,000,000.

3. Except as otherwise indicated, all statements in this Declaration are based on my personal knowledge of the Debtor's operations and finances gleaned during the course of Rock Creek's engagement, my discussions with the Debtor's senior management, other members of the Rock Creek team, the Restructuring Committee, and the Debtor's other advisors, as well as my review of relevant documents or my opinion based on my experience and knowledge of the Debtor's operations and financial condition. If called to testify, I would testify to each of the facts set forth herein based on such personal knowledge, discussions, review of documents, or opinion.

## Background and Qualifications

4. I have more than twenty (20) years of experience advising businesses facing operational and/or financial challenges, including companies in bankruptcy proceedings. I personally have assisted with over thirty (30) transactions involving the sale, private placement, or financial restructuring of middle market companies in North America and Europe.

5. In 1994, I received a Bachelor of Arts in Economics from Syracuse University. Additionally, I am a Certified Insolvency and Restructuring Advisor and a Certified Turnaround Professional.

---

[3] The *Debtor's Emergency Motion for Entry of Interim and Final Orders (A) Authorizing Debtor to Obtain Post-Petition Financing and to Grant Security Interests and Super-Priority Administrative Expense Status Pursuant to 11 U.S.C. §§ 105, 364(c) and 364(d); (B) Utilize Cash Collateral and Pay Certain Related Fees and Charges; (C) Modifying the Automatic Stay Pursuant to 11 U.S.C. § 362; and (D) Scheduling a Final Hearing Pursuant to Bankruptcy Rule 4001*(the "DIP Motion"), filed contemporaneously herewith.

6. Rock Creek is a financial services firm that works with companies and their investors, shareholders, directors, lenders and other relevant constituents to help companies maximize their true potential. Rock Creek has expertise in turnarounds, assignments for the benefit of creditors, financial advisory services, and liquidations.

7. Rock Creek has extensive experience in complex financial restructurings. Rock Creek has served as a sales agent and/or financial advisor for debtors and other parties in many bankruptcy cases in the throughout the United States, including: *In re Kologik, LLC*, Case No. 24-10311 (Bankr. M.D. La. April 25, 2024); *In re 8e14 Networks, Inc. d/b/a Ananda Networks*, Case No. 22-10708 (Bankr. D. Del. September 6, 2022 ) (BLS); *In re Retrotope*, Case No. 22-10228 (Bankr. D. Del. May 13, 2022) (JTD); *In re Tix Corp.*, Case No. 21-14170 (Bankr. D. Nev. Aug. 24, 2021); *In re VTES, Inc., et al.*, No. 20-12941 (JLG) (Bankr. S.D.N.Y. Feb. 24, 2021); *In re Barfly Ventures, LLC*, Case No. 20-01947 (JWB) (Bankr. W.D. Mich. June 6, 2020); *In re NinePoint Medical, Inc.*, Case No. 20-12618 (KBO) (Bankr. D. Del. Oct 16, 2020); *In re JRV Group USA L.P.*, Case No. 19-11095 (CSS) (Bankr. D. Del. May 12, 2019); *In re Sedgwick LLP*, Case No. 18-31087 (HLB) (Bankr. N.D. Cal. Oct. 2, 2018).

**Rock Creek's Retention**

8. On June 3, 2025, the Debtor retained Rock Creek as sales agent and financial advisor to, among other things: (i) assist the Company in evaluating strategic restructuring alternatives; (ii) assist the Company with preparation of a 13-week cash forecast including professional fees related to potential restructuring alternatives; (iii) assist the Company in obtaining and negotiating debtor-in-possession financing; and (iv) advise the Debtor and its counsel in the preparation for the commencement of this Chapter 11 Case. Throughout its engagement, Rock Creek has worked closely with the Debtor's management and other

restructuring professionals and has become knowledgeable and familiar with the Debtor's capital structure, liquidity needs and business operations.

## Background

9. Prior to the Petition Date, I assisted the Debtor with a 13-week cash flow budget (the "Original Budget") assuming, among other things, that as of and after the Petition Date the Debtor's operations would continue operating, uninterrupted in the ordinary course. Based on those assumptions the Original Budget reflected sufficient liquidity to fund the Debtor's operations through a sale closing at the end of July 2025.

10. As explained in more detail in the Ellis Declaration and Cash Management Motion, the "Money To Run Your School" business ("Money To Run") relies on funding by Bank of America to finance the purchase of receivables from charter schools (the "BofA Funding").[4] The funds received by schools in connection with these receivables purchases are used to pay operating expenses of the schools, including payroll obligations to teachers.

11. Prior to the Petition Date, in the ordinary course of business, funding requests were sent to Bank of America on a weekly basis pursuant to the Note Purchase Agreement[5] based on the specific funding needs of CSC's Money To Run customers.

12. Since the Petition Date, non-debtor PCSRC has submitted weekly funding requests to Bank of America in the ordinary course (the "Post-Petition Funding Requests") seeking funding to finance the payroll and other operational needs of the schools.

---

[4] In the ordinary course, CSC purchases receivables from schools, sells those receivables to non-debtor subsidiary PCSRC, and PCSRC funds its purchase of those receivables with the BofA Funding.

[5] The Debtor is a party to a Note Purchase Agreement by and among Bank of America as investor, the Debtor, as servicer and as a seller, Charter School Funding Company, LLC, as a Seller, and PCSRC, as issuer, dated as of July 9, 2021, as amended and further supplemented or otherwise modified and in effect from time to time (the "Note Purchase Agreement").

13. Notwithstanding the submission of these Post-Petition Funding Requests, since the Petition Date, Bank of America has declined to provide any funding to allow for the purchase of receivables under the Money to Run business.

14. Representatives of the Debtor have contacted representatives of Bank of America via e-mail and phone concerning the Post-Petition Funding Requests. To-date, Bank of America has not provided a reason for refusing to provide BofA Funding in response to the Post-Petition Funding Requests.

15. Absent a reliable funding source for the Money To Run business, the Debtor will be unable to fund the receivables purchases because it lacks sufficient cash liquidity and the schools that rely on Money To Run will lose access to important funding, resulting in disruption to operations and, in some instances, inability to meet statutorily required payroll obligations. Consequently, the Money To Run business line would be required to close down immediately.

16. Given Bank of America's refusal to continue the Receivables Cycle, the Restructuring Committee, with the input of the Debtor's management and the Debtor's professional advisors, instructed Rock Creek to seek to obtain debtor-in-possession financing to allow the Debtor to preserve its Money To Run business and continue operating as a going concern as it pursues the Sale.

17. Since that time, Rock Creek has solicited third-party interest in providing a DIP Facility to the Debtor, and has engaged with four (4) parties that regularly provide post-petition financing in the middle market and lower middle market spaces. After signing non-disclosure agreements and getting access to the data room, these parties conducted varying levels of diligence over the last two and a half weeks.

18. On or about June 26, 2025, the Debtor received a formal proposal for post-petition financing from East West Bank (the "DIP Lender") – the only binding proposal received. Since then, the Debtor, the DIP Lender and their respective advisors have negotiated at arms-length and in good faith on terms of DIP financing that will provide the liquidity necessary to continue operating the Money To Run business and ensure that the Debtor can continue operating in the ordinary course through a value maximizing sale process.

19. Rock Creek assisted in the development of the Debtor's cashflow forecast during this Chapter 11 Case (the "Initial DIP Budget"), which takes into account anticipated cash receipts and disbursements during the projected period and considers a number of factors, including, but not limited to, the effect of a chapter 11 filing on the operations of the business, restructuring costs (including professional fees), costs to continue operating the Money To Run business, and required operational payments.

20. On June 29, 2025, the Debtor and the DIP Lender agreed to the terms of proposed post-petition financing (the "DIP Facility") provided by East West Bank (the "DIP Lender") on the terms and conditions set forth in the term sheet dated as of June 29, 2028 (the "Term Sheet") and the form of proposed interim order (the "Interim Order") approving the DIP Facility.

**Overview of the DIP Facility**

21. The proposed DIP Facility is a delayed draw term loan, with a total commitment of $5 million, which is based on the Initial DIP Budget annexed to the Interim Order as Exhibit 1. On or after the entry of an Interim DIP Order approving the DIP Facility, the Debtor may request an initial draw in an amount not to exceed $2,500,000. On and after the entry of the Final DIP Order, the Debtor may request draws of Subsequent DIP Loans in increments not less than $1,000,000, up to the full $5,000,000 DIP Commitment in the aggregate. Under the DIP Facility,

interest accrues at a rate of 12% per annum, in kind and shall be payable in full on the date on which the final principal amount of the DIP Loans are paid.  The DIP fees include a: (i) 2.5% upfront fee on total DIP Commitment, earned, non-refundable, and allowed on a final basis upon entry of the Interim Order and payable from the proceeds of the Interim DIP Loan draw;  (ii) 5% exit fee on the total DIP Commitment, earned, non-refundable, and allowed on a final basis upon entry of the Interim Order and paid in cash upon the repayment of the DIP Loans; and (iii) 2% Extension Fee on the total DIP Commitment if the Debtor, with the consent of the DIP Lender, extends the Initial Maturity Date.  The DIP Facility will be secured by all of the Debtor's assets.

22. A full summary of the terms of the DIP Facility is included in the DIP Motion.

**Debtor's Need for DIP Loans and Interim Relief**

23. Based on my experience in the restructuring industry generally and my experience with the Debtor in particular, I believe that approval of the proposed DIP Facility is essential for the continued normal course operation of the Debtor's business and the successful completion of a going-concern sale transaction.  It is my view that without the DIP Facility, the Debtor will not have sufficient liquidity to continue operating the Money To Run business, which negatively impacts the sale process and diminishes the likelihood of recoveries for creditors in this Chapter 11 Case.

24. If the Debtor cannot secure the DIP Financing as soon as possible, the Debtor will need to shutter its Money To Run business line, and the value that the Debtor will receive through its sale process will likely be negatively impacted, causing immediate and irreparable harm.  The Debtor's reputation in the industry is at issue here: schools rely on the Debtor for the funds they obtain through the purchase of receivables.  These funds are critical to the school, as they pay the schools' operating expenses, including payroll for teachers.  Absent immediate access to the

proceeds for the DIP Facility, the schools that rely on the Money To Run business will lose access to this critical cash flow, and the Debtor's reputation and business will be immediately and irreparably impaired. Access to committed financing today will help stabilize the receivables business, and quell uncertainty among the Debtor's employees, vendors and partners by providing immediate assurance that the Debtor will have the necessary funding to bridge to a going-concern sale transaction. Moreover, given the increased risk of employee flight as a result of this business disruption, a need for a key employee retention plan has arisen, which the Debtor will likely be filing a motion for approval of in the coming days and will use proceeds from the DIP Facility to fund.

25. In my professional opinion, without access to interim funding under the DIP Facility, the Debtor's ability to preserve the Money To Run business and its ordinary course operations to complete the Sale would be in jeopardy.

26. It is, therefore, my belief that the relief sought herein is necessary to enable the Debtor to continue the Money To Run business and avoid immediate and irreparable harm to the Debtor's estate.

## The DIP Facility Should Be Approved

27. Based on my experience in representing debtors and creditors in chapter 11 cases and distressed financial transactions, I believe that the terms of the proposed DIP Facility are reasonable under the circumstances. The fees included are an integral component of the overall terms of the DIP Facility and were required by the DIP Lender as consideration for the extension of post-petition financing. The contemplated fees and other terms of the DIP Facility are reasonable and were the subject of arm's-length and good faith negotiations.

28.     Based on Rock Creek's solicitation efforts and in my professional experience, I do not believe that alternative sources of post-petition financing are currently available to the Debtor (whether secured, unsecured, or on an administrative priority basis) on terms better than or comparable to the DIP Facility.

29.     Accordingly, it is my belief that the proposed DIP Facility represents the best post-petition financing option currently available to address the Debtor's immediate liquidity needs under the circumstances of this Chapter 11 Case and that the terms and conditions of the DIP Facility are reasonable under the current circumstances.

[*Remainder of page intentionally left blank*]

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing statements are true and correct.

Dated: June 29, 2025

By: 

/s/ Brian Ayers
_____

Name: Brian Ayers

Title: Managing Director

*Proposed Financial Advisor and Sales Agent to the Debtor and Debtor in Possession*